**CONTINENTAL CASUALTY COMPANY, Appellant,**

**v.**

**James E. BAKER, Appellee.**

**No. 01–09–00881–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 25, 2011.

David Swanson, Erin Kaye Holmes, Jane Lipscomb Stone, Stone Loughlin & Swanson, LLP, Austin, TX, for Appellant.

Alan Brandt Daughtry, Henry David Drewinko, Michael P. Doyle, Doyle Raizner LLP, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION ON REHEARING

EVELYN V. KEYES, Justice.

Appellee James E. Baker filed a motion for en banc reconsideration of our May 5, 2011 opinion. We treat the motion for en banc reconsideration as a motion for rehearing, grant rehearing, withdraw our May 5, 2011 opinion and judgment, and issue this opinion and judgment in their place. The disposition of the case remains unchanged.

In this workers' compensation case, appellant, Continental Casualty Company ("Continental"), brought suit for judicial review of the decision of the Texas Department of Insurance, Division of Workers' Compensation ("Division") in favor of Baker. The jury found that Baker's compensable injury extended to a left knee meniscus tear identified on an MRI over five years after his work-related accident. The trial court entered judgment in favor of Baker and awarded $134,694.80 in trial-level attorney's fees and expenses and $33,500 in conditional appellate attorney's fees. In six issues, Continental contends that (1) the trial court erred in giving a charge that included an instruction on additional injuries, an instruction on aggravation injuries, and an incorrect instruc-

tion on producing cause; (2) the trial court erroneously allowed Baker to present a PowerPoint presentation displaying excerpts of evidence during opening statements; (3) the trial court improperly excluded a medical report made to the Division as hearsay; (4) the trial court improperly allowed Baker's treating doctor to testify as an expert regarding causation of the 2005 meniscus tear because he was not qualified to render such an opinion and his opinions were not scientifically reliable; (5) factually insufficient evidence supported the jury's verdict; and (6) the trial court erroneously determined the amount of Baker's reasonable and necessary attorney's fees, denying Continental its right to have a jury determine this issue.

We reverse the judgment and remand the case for further proceedings.

### Background

On July 12, 2000, James Baker was injured during the course of his employment when he stepped off a ladder, lost his balance, and twisted his left knee. Baker sought workers' compensation benefits from Continental, his employer's insurance carrier. Continental initially agreed that Baker's injury was compensable and accepted the claim; however, it now disputes the extent of Baker's injury. Specifically, Continental disputes whether the compensable injury includes a tear of the medial meniscus in Baker's left knee that was identified in 2005.

On July 26, 2000, Baker underwent a magnetic resonance imaging scan ("MRI") on his left knee. The radiologist interpreting the MRI results preliminarily diagnosed Baker with a "degenerative tear of the posterior horn of the medial meniscus which reaches both the inferior and superior articular surfaces." Shortly after this MRI, Baker was examined by Dr. William

Woods, an orthopedic surgeon who specializes in knee surgery. Dr. Woods noted that Baker had pre-existing arthritis, a positive McMurray's test, which indicated an injury to the inside part of his knee, swelling, and "numerous loose bodies" of cartilage in the knee. Before performing arthroscopic surgery on Baker's left knee, Dr. Woods tentatively diagnosed Baker with a medial meniscus tear and articular injury. He had observed a "large amount of degenerative change in the meniscus," which he stated is sometimes interpreted by radiologists as a tear in the meniscus. Dr. Woods opined that the only way to confirm a meniscus tear, as opposed to a degenerative change in the meniscus, is to examine and probe the meniscus during arthroscopic surgery.

Dr. Woods performed arthroscopic surgery on Baker in August 2000, but found no visible tear in the meniscus. Therefore, he did not operate on a meniscus tear or perform a partial menisectomy. Instead, he performed arthroscopic debridement of the patella, arthroscopic removal of loose bodies, and extensive arthroscopic partial synovectomy, or surgical removal of a synovial membrane.

Baker returned to work in October 2000, and, in November 2000, Dr. Woods believed that Baker had reached maximum medical improvement. Specifically, Dr. Woods believed that Baker would never have a normally functioning knee and that he would continue to have knee problems due to his pre-existing arthritis.

In March 2001, Baker, who was experiencing continued pain in his left knee, visited a chiropractor, Dr. David Durkop, for further treatment and physical therapy. When the pain persisted despite rehabilitation exercises, Dr. Durkop referred Baker to Dr. Lubor Jarolimek, an orthopedic surgeon. In light of Baker's continued pain, Dr. Jarolimek ordered a second MRI on Baker's left knee in May 2001. This MRI reflected that: "The anterior horn of the lateral meniscus has grade II degenerative changes. There are also prominent grade II degenerative changes in the posterior horn of the lateral meniscus. The anterior horn of the medial meniscus shows Grade II degenerative changes. Prominent Grade II changes in the posterior horn of the medial meniscus." The radiologist interpreting this MRI noted degenerative changes and thinning in both the anterior and posterior horns of the lateral meniscus, but stated that "[n]o grade III or IV tears [are] demonstrated."

Dr. Jarolimek continued to treat Baker over the next five years. Throughout this time period, Baker continuously displayed pain and tenderness in his left knee. Dr. Jarolimek ordered a third MRI for Baker in December 2005, five years after Baker's injury, first MRI, and surgery, and four and one-half years after Baker's second MRI. This MRI demonstrated a "complex tear of the body and posterior horn of the medial meniscus. No definite lateral meniscal tear is appreciated."

Continental disputed Baker's assertion that his July 2000 workplace accident caused the meniscus tear seen on the December 2005 MRI, and it denied further workers' compensation benefits. After Continental and Baker were unable to resolve the dispute at a Benefits Review Conference, a contested case hearing was held before the Division on October 10, 2006. The sole issue at the hearing was whether "the compensable injury extend[ed] to include the left knee meniscus tear identified on the MRI of December 5, 2005." The hearing officer concluded that the compensable injury extended to include the meniscus tear identified on the December 2005 MRI.

After the Appeals Panel declined to reverse the decision, Continental brought

this suit for judicial review of the hearing officer's decision. Baker filed a general denial and asserted a counterclaim to recover statutory attorney's fees pursuant to Texas Labor Code section 408.221(c).

Before trial, Continental sought to exclude the expert medical testimony of Dr. Jarolimek on the grounds that (1) he lacked the necessary qualifications to render an expert opinion on the cause of the 2005 meniscus tear, (2) his opinion that Baker had had a meniscus tear since July 2000 that developed into the tear shown on the December 2005 MRI was not based on an accurate and reliable foundation, and (3) his alternate opinion, that Baker had an "intrasubstance tear" in the left knee meniscus that developed into a full-thickness tear, was based purely on speculation and thus was not reliable. The trial court denied this motion and allowed Dr. Jarolimek's testimony.

During Baker's opening statement, Baker's counsel displayed a PowerPoint presentation that included excerpts from the July 2000 and December 2005 MRI reports, with the dates of the reports and the radiologist's interpretations highlighted and emphasized in boxes on the slides. The presentation also contained an excerpt of the hearing officer's decision, with its ultimate conclusion highlighted in a box. Baker also included excerpts from the video deposition testimony of Nina Rose, Continental's corporate representative, Dr. Woods, Dr. Jarolimek, and Dr. Marvin Van Hal, Continental's expert witness, in the presentation.

All of the doctors testified at trial via video deposition. Dr. Woods testified that there is a subjective element to interpreting MRI results, as one radiologist might interpret a meniscus as having "degenerative thinning" and another radiologist might interpret the results as a "degenerative tear" in the meniscus. Dr. Woods stated that actually examining the meniscus during surgery was the "only way you can really tell if it's a tear versus degenerative change." When asked about the three different ways in which Baker's meniscus was described in the MRI reports, Dr. Woods opined that they were all different ways of "saying the same thing." Dr. Woods testified that, when he performed arthroscopic surgery on Baker's left knee in August 2000, he did not observe any tears in the meniscus. Dr. Woods did not believe that a person could have a meniscus "tear" that was not visible—he would instead classify that situation as a "degenerative change," or damage, to the body of the meniscus. In Dr. Woods' opinion, the damage caused by Baker's fall included loose pieces of cartilage and "visible damage to the bone surface," which he interpreted as aggravation of Baker's pre-existing arthritis. Dr. Woods agreed that, because he had not seen a meniscus tear when he performed surgery, there "couldn't have been a worsening of that tear over time up until 2005."

Continental retained Dr. Marvin Van Hal, an orthopedic surgeon, as its medical expert. Dr. Van Hal opined that the visual examination of the meniscus by a surgeon is more accurate than MRI reports due to the potential for false findings on the MRI. Dr. Van Hal testified that based on the subsequent arthroscopic surgery and the pictures taken during that surgery that demonstrated no meniscus tear, he believed that the radiologist interpreting the July 2000 MRI made an inaccurate finding that a meniscus tear existed. According to Dr. Van Hal, because "there was no meniscal tear that was there to start with," a tear could not propagate and recur. Dr. Van Hal opined that the meniscus tear identified in December 2005 "was

due to something different than the on-the-job injury of July 12, 2000."

On cross-examination, Dr. Van Hal admitted that he was unable to get access to the MRI films and that he did not review the pictures taken during the arthroscopic surgery, although he was able to compare the reports from the three MRIs and compare the MRI reports to Dr. Woods's post-operative report. Dr. Van Hal disagreed that the radiologist actually found a meniscus tear in 2000, and instead stated that the radiologist "interpreted it as a meniscus tear." When asked what mechanism could cause the 2005 meniscus tear, other than the workplace accident, Dr. Van Hal responded that everyday work and life, as well as physical therapy for the compensable injury, could possibly have caused the tear. Dr. Van Hal stated that because it is unclear what specific exercises Baker did during physical therapy, he could not rule out the therapy as a cause of the tear.

Baker called Dr. Jarolimek, his treating doctor for over five years, as an expert witness. Dr. Jarolimek testified that, in his opinion, Baker's current meniscus tear was "directly related to his work-related injury of 2000." Dr. Jarolimek stated that, at the time of the accident, Baker sustained an injury to his meniscus, and after Dr. Woods performed a partial meniscectomy in August 2000, the meniscus tear that existed at that time "continue[d] to propagate" and developed into the tear identified on the 2005 MRI. According to Dr. Jarolimek, the fact that Baker continued to have pain and tenderness in his knee well after he had arthroscopic surgery suggests that "there still is some type of a problem, a mechanical problem within the knee, persistent pain or perhaps a recurrent meniscal tear." He opined that the MRI reports were consistent with the Division's ruling that the 2005 meniscus tear was related to the workplace accident because all of Baker's symptoms and test results over the years were "consistent with meniscal-type pathology."

Dr. Jarolimek further testified that there are different degrees of meniscus tears, including intrasubstance tears—a tear within the body of the meniscus—and a tear "do[es] not necessarily have to be through and through" to be considered a tear. Baker's counsel instructed Dr. Jarolimek to assume that Dr. Woods had not performed a meniscectomy in August 2000 and then asked whether that would change Dr. Jarolimek's opinion regarding the cause of the 2005 meniscus tear. Dr. Jarolimek responded that his opinion would not change because "a meniscal tear could be an intrasubstance tear and may propagate and become a full thickness tear later." Dr. Jarolimek testified that, although the 2001 MRI does not show a "Grade III or IV tear" in the meniscus, it does show pathology in the meniscus and this result, coupled with the 2000 and 2005 MRIs showing a tear in the same place in the meniscus, indicates that the torn meniscus has "always been there" since the accident and has not been addressed.

On cross-examination, Dr. Jarolimek admitted that he had taken the board certification exam in orthopedic surgery twice, but had not passed it. He also admitted that he had not reviewed the report or the films from the July 2000 MRI. Dr. Jarolimek stated that his understanding from reading the operative report following Baker's arthroscopic surgery was that Dr. Woods performed a meniscectomy. Dr. Jarolimek further agreed with Continental's counsel that if a radiologist interpreted an MRI as showing a meniscus tear, but he did not see a tear while performing arthroscopic surgery, he would "believe [his] own eyes" over the MRI.

The jury charge included only one question, Question No. 1: "Do you find that the

Plaintiff, Continental, established by a preponderance of the evidence that the compensable injury of July 12, 2000 does not extend to or include the left knee meniscus tear identified on the MRI of December 5, 2005?" "Compensable injury" was defined as "an injury that arises out of and in the course and scope of employment for which compensation is payable. The definition of compensable injury includes extension injuries." "Extension Injuries" were defined as "injuries occurring in the probable sequence of events and arising from the actual compensable injury," and the jury was informed, "[a]dditional injuries that result from treatment instituted to relieve or cure the compensable injury are compensable extension injuries." "Injury" was defined as "damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm." "Injury" was also separately defined as "also includ[ing] the excitement, acceleration, or aggravation of any injury, disease, infirmity or condition, previously or subsequently existing, by reason of such damage or harm."

The jury was instructed that "the Appeals Panel of the Texas Department of Insurance: Division of Workers' Compensation determined that James Baker's compensable injury of July 12, 2000 extends to and includes the left knee meniscus tear identified on the MRI of December 5, 2005." It was further instructed that "the burden of proof is on Continental to prove by a preponderance of evidence that James Baker's July 12, 2000 injury was not a producing cause of the meniscus tear identified on the MRI of December 5, 2005." Finally, it was instructed,

> Producing cause is an efficient, exciting, or contributing cause that, in the natural sequence, produces the injury, disability or illness in question. A workplace accident or disease is considered a producing cause even if it is not a substantial

factor in bringing about the injury, disability, or illness. In a workers' compensation case, there may be more than one producing cause of an injury.

At the charge conference, Continental objected to the inclusion of extension injuries in the definition of compensable injury under Question No. 1. It proposed that the separate definition of extension injuries be deleted from the charge and that the reference to extension injuries be deleted from the definition of compensable injury. Continental also objected to "the last phrase [in the definition] about the additional injuries that result from the treatment instituted to relieve the compensable injury." It argued that the definition was duplicative of the burden of proof set out in Question No. 1, which required that Continental prove "by a preponderance of the evidence that the compensable injury of July 12, 2000 did not extend to or include the left knee meniscus tear identified on the MRI of December 5, 2005." Baker responded, "[T]his is a proper statement of the law." The court overruled Continental's objection.

Continental also objected to the inclusion of four definitions of "injury" in the definitions below Question No. 1 and argued that the correct definition was "danger, harm to the physical structure of the body, a disease or infection naturally resulting from a damage or harm." It objected that "it's incorrect and prejudicial to also say that an injury also includes excitement, acceleration or aggravation of any injury, disease or infirmity, or condition previously or subsequently existing for reasons as danger or harm." Continental sought a substitute definition, which would have stated, "The injury also includes the aggravation of any disease, infirmity or condition previously existing by reason of

such damage or harm." The court overruled the objection.

Finally, Continental objected to the instruction and definition on producing cause in the general instructions on the basis that it introduced a producing cause definition separate from the definition of injury and was confusing. It stated, "The standard is whether there's a direct and natural progression or cause, or whether a condition is the direct and natural result of a compensable injury. The burden is by preponderance of the evidence." It contended that including a separate instruction on producing cause was "redundant and prejudicial." The court overruled Continental's objection.

The jury answered "No" to Question No. 1.

Baker did not request, and the charge did not include, a question asking the jury to determine the amount of his reasonable and necessary attorney's fees. However, after the jury found in favor of Baker, Baker moved for entry of judgment and for $149,047.16 in trial attorney's fees and expenses, $1,600 for post-verdict fees and expenses, and $64,000 in conditional appellate fees to be awarded by the trial court. Continental objected to Baker's recovery of attorney's fees, contending that he waived such recovery by failing either to request a jury question on reasonable and necessary fees or to object to the omission of such a question. Continental also objected to the trial court's determining the amount of attorney's fees solely by written evidence, contending that it was entitled to either a jury determination or, at least, a bench trial on the issue of reasonable and necessary fees. The trial court overruled both objections, and after multiple hearings and supplemental motions, ultimately awarded Baker $134,694.80 for trial attorney's fees and expenses, $6,071.25 for post-

trial fees, and $33,500 in conditional appellate fees.

## Jury Charge Errors

In its first issue, Continental contends that the trial court erred in (1) including an instruction that Baker's compensable injury encompassed "extension injuries" resulting from treatment of the original injury because the issue of extension injuries was not raised by the pleadings or the evidence and improperly increased its burden of proof; (2) including an instruction that compensable injury includes the aggravation of a pre- or subsequently-existing injury because the issue was not raised by the pleadings or the evidence and including "subsequently existing" was not a proper statement of the law; and (3) including an instruction on producing cause because producing cause is irrelevant to disputes over the extent of an injury, producing cause was not raised by the pleadings, and the trial court's definition of producing cause was legally incorrect.

### A. Standard of Review

▇▇▇▇ The trial court "shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex.2010) (quoting *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002)). Generally, we review the trial court's decisions on how to charge the jury for an abuse of discretion; however, when the appellant challenges a definition as legally incorrect, we review the definition de novo. *Id.*; *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex.2002). If the charge is legally correct, the trial court has broad discretion regarding the submission of questions, definitions, and instructions.

*Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 664 (Tex.1999). We therefore review the trial court's legally correct definitions and instructions for an abuse of discretion. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000).

We will not reverse a judgment for charge error "unless the error was harmful because it probably caused the rendition of an improper verdict...." *Crump,* 330 S.W.3d at 225 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 856 (Tex.2009)). Charge error is "generally considered harmful if it relates to a contested, critical issue." *Id.* (quoting *Hawley,* 284 S.W.3d at 856). When determining whether an erroneous instruction or definition probably caused an improper judgment, we examine the entire record. *Id.* (quoting *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex.2001)).

To preserve a charge error complaint for appellate review, a party must "point out distinctly the objectionable matter and the grounds of the objection." Tex.R. Civ. P. 274. "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id.* An objection does not meet Rule 274's requirements unless "the defect relied upon by the objecting party and the grounds of the objection are stated specifically enough to support the conclusion that [the] trial court was fully cognizant of the ground of complaint and deliberately chose to overrule it." *Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.,* 134 S.W.3d 385, 404 (Tex.App.-Houston [1st Dist.] 2004, pet. dism'd). To preserve charge error, the appellant must "clearly designate the alleged error and specifically explain the basis of its complaint in its objection to the charge." *Id.* at 404–05; *C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768, 793 (Tex.App.Houston [1st Dist.] 2004, no pet.) ("To be sufficiently specific, the party's objection must identify the claimed error and explain the basis of the party's complaint."). We determine whether a party has preserved a complaint of charge error by "inquiring whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *C.M. Asfahl Agency,* 135 S.W.3d at 793 (citing *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992)). Objections to the charge and requests for instructions must comport with the arguments made on appeal. *Wackenhut Corrections Corp. v. de la Rosa,* 305 S.W.3d 594, 616 (Tex.App.-Corpus Christi 2009, no pet.).

### B. Instruction on Producing Cause

Continental contends that the trial court erred in including an instruction on producing cause because (1) producing cause is inapplicable in disputes over the extent of a compensable injury, (2) a producing cause theory was not raised by the pleadings, and (3) the definition of producing cause did not contain a "substantial cause" or "but-for" element and was therefore legally incorrect. Baker responds that Continental's issue on producing cause was not preserved.

The trial court included the following instruction and definition relating to producing cause in the charge:

You are instructed that the burden of proof is on Continental to prove by a preponderance of evidence that James Baker's July 12, 2000 injury was not a producing cause of the meniscus tear identified on the MRI of December 5, 2005.

*Producing cause is an efficient, exciting, or contributing cause that, in the*

*natural sequence, produces the injury, disability or illness in question. A workplace accident or disease is considered a producing cause even if it is not a substantial factor in bringing about the injury disability or illness.* In a workers' compensation case, there may be more than one producing cause of an injury.

(Emphasis added.) The charge also included the following definitions related to "injury":

"Compensable injury" means an injury that arises out of and in the course and scope of employment for which compensation is payable. The definition of compensable injury includes extension injuries.

"Extension Injuries" means injuries occurring in the probable sequence of events and arising from the actual compensable injury. Additional injuries that result from treatment instituted to relieve or cure the compensable injury are compensable extension injuries.

*"Injury" means damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm.*

"Injury" also includes the excitement, acceleration, or aggravation of any injury, disease, infirmity or condition, previously or subsequently existing, by reason of such damage or harm.

(Emphasis added.)

At the charge conference, Continental made the following objection to the producing-cause instruction and definition:

Continental: And the objection, Your Honor, is to the inclusion of a definition of producing cause. We believe, to be specific, that including a producing cause definition is confusing. The standard is whether there's a direct and natural progression or cause, or whether a condition is the direct and

natural result of a compensable injury. The burden is by a preponderance of the evidence. Our objection is inclusion of a producing cause definition separate from the definition of injury. And since I'm not proposing an alternate instruction, I'm not giving you something written to reject, but I'd like the ruling on the record, please.

The Court: You say your objection is because it's separate from the definition of injury?

Continental: No, because I believe that is inclusive within the definition of injury and inclusive within other definitions in the charge, such as the extension definition and the aggravation definition. I think it's redundant and prejudicial, that's all.

Continental thus objected to the instruction and definition on producing cause on the basis that it was confusing because "[t]he standard is whether there's a direct and natural progression or cause, or whether a condition is the direct and natural result of a compensable injury," and that particular standard was already included in the definition of injury in the charge, so that the additional instruction was redundant and prejudicial. It contended, "The correct definition [of injury] is danger, harm to the physical structure of the body, a disease or infection naturally resulting from a damage or harm."

We construe Continental's objection to be that the instruction was improper because it did not assist the jury and it inaccurately stated the law by giving an instruction on producing cause that conflicted with the definition of a compensable injury as one "naturally resulting" from a harm. *See Crump*, 330 S.W.3d at 221. Baker contends, however, that because Continental did not complain at trial re-

garding the lack of a substantial factor or but-for component in the producing cause definition and stated that it was not proposing an alternative definition, Continental failed to preserve error regarding this definition. *See* Tex.R. Civ. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.").

First, because Continental's objection to the producing cause definition was that it should not have been included at all because it confused an otherwise correct instruction, we conclude that Continental satisfied its burden of proffering an alternative charge—one that omitted the defective definition of producing cause. Therefore, we hold that Continental did not fail to preserve error merely by failing to proffer an alternative definition of producing cause. We therefore address whether the definition of producing cause included in the charge was legally incorrect.

Historically, in workers' compensation cases, "producing cause" did not require the workplace injury to be a substantial factor in bringing about the employee's disability. *See, e.g., Flores v. Emps. Ret. Sys. of Tex.*, 74 S.W.3d 532, 549 (Tex.App.-Austin 2002, pet. denied). While this case was pending on appeal, however, the Texas Supreme Court, in *Crump*, concluded that "[t]he producing cause inquiry in workers' compensation cases is conceptually no different from the cause in fact inquiry in negligence cases and the producing cause inquiry in other substantive contexts." 330 S.W.3d at 223; *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007) (holding, in products liability context, that producing cause definition should include "substantial factor" and "but-for" component). The supreme court held that

"producing cause in workers' compensation cases is defined as a substantial factor in bringing about an injury or death, and without which the injury or death would not have occurred." *Crump*, 330 S.W.3d at 223. The court held that the omission of "but-for" language in the charge rendered the definition of producing cause submitted to the jury incomplete and legally incorrect. *Id.* at 224–25. The court further observed that, because the parties' respective medical experts disagreed regarding whether Crump's workplace accident caused his death, "[t]he but-for aspect of causation was squarely at issue in [the] case" and the charge error " 'relate[d] to a contested, critical issue'—indeed, the sole issue—that of causation." *Id.* at 226. Because including a "but-for" component in the producing cause definition "would have assisted the jury in resolving the disputed expert testimony at the crux of the case and, more importantly, would have stated the law accurately," the court held that the incorrect definition probably resulted in an improper judgment and, therefore, constituted reversible error. *Id.*

Here, the definition of "producing cause" in the charge, which Continental sought to have removed, expressly stated, "A workplace accident or disease is considered a producing cause even if it is *not* a substantial factor in bringing about the injury, disability, or illness" in question in the case. (Emphasis added.) This is a legally incorrect definition of "producing cause" under *Crump*. *See id.*

 Both parties acknowledge that, at the time of the trial, the Texas Supreme Court had not yet issued its opinion in *Crump*, and therefore the governing law was the Fourteenth Court of Appeals' decision in *Crump*, which specifically approved of a definition of producing cause that was similar to the one the trial court submitted

here.[1] *See Transcon. Ins. Co. v. Crump*, 274 S.W.3d 86, 100 (Tex.App.-Houston [14th Dist.] 2008), *rev'd*, 330 S.W.3d 211 (Tex.2010); *see also INA of Tex. v. Howeth*, 755 S.W.2d 534, 537 (Tex.App.-Houston [1st Dist.] 1988, no writ) ("It is enough if [the injury] is 'a' cause, even though there were other causes."). Generally, however, a supreme court decision operates retroactively unless the court exercises its discretion to provide otherwise. *Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex.1992) (per curiam). Thus, when the applicable law changes during the pendency of an appeal, we must render our decision in light of the change in the law. *Blair v. Fletcher*, 849 S.W.2d 344, 345 (Tex.1993) (per curiam).

■ Considering that the parties lacked the benefit of the supreme court's decision in *Crump* at the time of trial, we hold that Continental's objection to the definition of producing cause adequately preserved error. *See Lubbock Cnty. v. Strube*, 953 S.W.2d 847, 858 (Tex.App.-Austin 1997, pet. denied) (holding general objection to submission of question asking jury to determine attorney's fees as percentage of recovery sufficient to preserve error when *Arthur Andersen v. Perry Equipment Corp.*, prohibiting juries from determining attorney's fees by awarding percentage of recovery, was decided during pendency of appeal).

■ Continental bore the burden of proving, by a preponderance of the evidence, that Baker's workplace accident in 2000 was not a producing cause of the left knee meniscus tear observed in 2005. *See* Tex. Labor Code Ann. § 410.303 (Vernon 2006); *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 (Tex.2007) ("[T]he appealing party bears the burden of proof by a preponderance of the evidence."). It is undisputed that the definition of producing cause submitted to the jury did not include the "but-for" or "substantial factor" component set out as the standard in *Crump*. *See* 330 S.W.3d at 223–25. To the contrary, it correctly instructed the jury that Continental's burden was "to prove by a preponderance of evidence that James Baker's July 12, 2000 injury was not a producing cause of the meniscus tear identified on the MRI of December 5, 2005." But, it then erroneously instructed the jury that "[a] workplace accident or disease is considered a producing cause *even if it is not a substantial factor* in bringing about the injury, disability or illness." (Emphasis added.) The *Crump* opinion makes it clear that these two standards of proof are in conflict and that "producing cause in workers' compensation cases is defined as a substantial factor in bringing about an injury or death, and without which the injury or death would not have occurred." 330 S.W.3d at 223. Thus, the instruction on producing cause was erroneous and confusing to the jury rather than of assistance to it, and it was, therefore, improper. *See id.* at 221.

■ As in *Crump*, the "but-for" or "substantial factor" aspect of causation was squarely at issue, and the charge error related to the sole issue in the case, that of causation. *See id.* at 226. Also as in *Crump*, the evidence in this case included conflicting expert testimony regarding whether the accident caused the meniscus tear, which was the sole question before the jury. *See Hawley*, 284 S.W.3d at 856

---

1. The trial court submitted the following definition of producing cause in *Crump*: " 'Producing cause' means an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question. There may be more than one producing cause." *Transcon. Ins. Co. v. Crump*, 274 S.W.3d 86, 95 n. 9 (Tex.App.-Houston [14th Dist] 2008), *rev'd*, 330 S.W.3d 211 (Tex.2010).

(holding that charge error is "generally considered harmful if it relates to a contested, critical issue"); *Toennies*, 47 S.W.3d at 480 ("An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting, as it was in the present case [when the trial court gave an incorrect causation standard]."). Because the erroneous and confusing instruction related to a contested critical issue, it was harmful and probably caused the rendition of an improper verdict. *See id.* at 226.

Accordingly, we hold that inclusion of the incorrect producing cause definition in the charge constituted reversible error.

We sustain Continental's first issue.

Because our disposition of this issue is dispositive of the merits of this appeal, we do not address Continental's two additional complaints regarding the jury charge, nor do we reach Continental's second, third, fourth, fifth, and sixth issues.

## Conclusion

We reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion. All pending motions are denied as moot.

Justice SHARP, concurring without opinion.