**Opinion issued December 3, 2020**



In The

# Court of Appeals

For The

# First District of Texas

—————————————————

## NO. 01-19-00095-CV

—————————————————

**BAYLOR MIRACA GENETICS LABORATORIES, LLC, Appellant**

**V.**

**THOMAS BRANDON PERTHUIS, Appellee**

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-16991**

---

### MEMORANDUM OPINION

Appellant Baylor Miraca Genetics Laboratories, LLC, (BMGL) employed appellee Thomas Brandon Perthuis as Vice President of Sales and Marketing and agreed to pay him a 3.5% commission on his net sales. BMGL terminated Perthuis in January 2017, and Perthuis then sought a commission based on sales BMGL

made after January 2017. The jury found that BMGL breached the commission agreement, and the trial court rendered judgment on the jury verdict. BMGL appeals, arguing in multiple issues that the trial court erred (1) in construing the commission agreement and in charging the jury; (2) in excluding evidence of its commission policy and practice; and (3) in the alternative, that no evidence supported the jury's findings. In a cross-appeal, Perthuis argues in his sole issue that the trial court erred in denying his request for attorney's fees under Civil Practice and Remedies Code Chapter 38.

Because we conclude that the trial court erred in construing the commission agreement and in instructing the jury, we reverse the judgment of the trial court and render judgment that Perthuis take nothing.

## Background

Perthuis was a National Sales Manager for Baylor College of Medicine's genetics lab when, in late 2014, Baylor College of Medicine entered a joint venture with Miraca Holdings, Inc. to form a new entity to conduct clinical genetics diagnostic activities. In connection with the joint venture, the newly formed entity, Baylor Miraca Genetics Laboratories (BMGL), offered Perthuis the position of Vice President of Sales & Marketing. Regarding compensation, the Employment Offer Letter stated:

> Your annual base salary will be $145,000 effective April 1, 2015. Your commission will be 3.5% of your net sales. . . . In addition, you

2

will be eligible to receive a retention bonus. More information on your retention bonus is included in the enclosed Retention Agreement.

The offer further stated that Perthuis's employment would be "at-will," "which means that you or BMGL may terminate your employment at any time for any reason, with or without cause, and with or without notice." Finally, the offer stated, "If you accept this offer, your employment will be subject to the Company's personnel policies and practice, which will initially be substantially similar to current Baylor policies."

Following the creation of the joint venture in 2015, Perthuis worked for BMGL as the Vice President of Sales and Marketing. He procured sales from several companies by securing what the parties referred to as "channel partners"—companies that agreed to purchase large volumes of genetic tests from BMGL under long-term contracts. For example, in 2015, Perthuis participated in negotiating a Laboratory Services Agreement (LSA) on behalf of BMGL with a company called Natera. The LSA provided that Natera would use its own sales staff to sell the tests under its own brand, and BMGL would provide "analytical services," or processing of genetic specimens. The LSA further provided that BMGL would meet certain obligations regarding the formatting of test results and timing for reporting certain test results. Natera agreed to pay an "exclusivity fee" in exchange for BMGL's agreement not to perform certain genetic tests for Natera's direct competitors, and Natera was obligated to meet minimum purchase

3

requirements to maintain this exclusivity. Natera also agreed to make a "pre-payment" of $1,000,000 for anticipated analytical services. The LSA stated that if the agreement was terminated by either party prior to Natera "ordering and taking delivery of $1,000,000 of Analytical Services, BMGL shall refund to Natera the remaining balance of the $1,000,000 pre-payment." The LSA further provided that BMGL would be obligated to refund the exclusivity fee if it terminated the agreement within twelve months of the agreement's effective date. The LSA set out terms for generating purchase orders, pricing for various genetic tests that varied depending on volume, invoicing and payment, and billing.

Perthuis testified that he did not receive any commission when the LSA was signed; rather, he collected commissions on sales made to Natera under this LSA throughout 2015 and 2016. He testified that BMGL calculated commissions quarterly based on the revenue from tests that had been ordered, performed, and billed to the proper account. He further explained that commissions were determined by totaling his revenue for a particular quarter, adjusting that amount for "bad debt" or particular clients' failure to pay 100% of their bills, and then multiplying that by his commission percentage.

In the fall of 2016, Perthuis was involved in negotiating a second amendment and extension of the Natera LSA. By the end of 2016, the negotiations on the amendment were nearing completion, and all material terms were in place

by early January 2017. BMGL then terminated Perthuis on January 23, 2017. The next day, on January 24, 2017, BMGL signed the amended Natera LSA with an effective date of January 30, 2017.

The Second Amended LSA added a new section, obligating BMGL to "develop and validate a non-invasive prenatal multi-gene sequencing screen" called "PreSeek." The Second Amended LSA also adjusted the terms for payment of "undisputed invoices," set out terms for exclusivity and prepayment of fees related to the PreSeek screening tests, and added new provisions regarding the minimum purchase requirements set out in previous LSAs. Natera purchased tests and analytical services under this contract after it became effective on January 30, 2017. Because Perthuis had been terminated, other BMGL personnel provided services to Natera. Just a few months after Perthuis's termination, BMGL personnel negotiated a Third Amendment to the Natera LSA without Perthuis's participation and that amendment became effective on April 3, 2017. Other companies, including Progenity, Fleury, and NIPT, were similarly recruited by Perthuis while he worked for BMGL and then continued to make purchases from BMGL after he was terminated by BMGL in January 2017 and eventually went to work for one of BMGL's direct competitors.

At trial, BMGL asserted that the commission agreement in the Employment Offer Letter entitled Perthuis to a commission on his net sales and that he was only

5

entitled to commissions while he was employed by the company. It presented evidence that, following his termination, it paid him commission due on his sales through his last day. For example, an email sent by Perthuis on the day he was terminated stated, "My offer says I get 3.5% of my sales. I have sold during these 20+ days in January. Can you please make sure this payment is included?" Perthuis then testified that BMGL paid him commissions "until January 23rd," but it did not pay anything after his termination on January 23, 2017.

Perthuis asserted at trial that he was the procuring cause of all sales to Natera and other channel partners he procured, including all sales during the nearly two-year period between his termination on January 23, 2017 and the time of trial in the fall of 2018. BMGL's sales reports showed that the "net sales" to the four accounts procured by Perthuis totaled approximately $44 million during the time between January 23, 2017, and September 30, 2018, so Perthuis argued that he was entitled to more than $1.5 million in sales commissions.

The trial court submitted the question of whether BMGL breached its commission agreement with Perthuis to the jury. The charge stated:

Perthuis' "sales" included all sales for which he was the procuring cause.

A "procuring cause" of a sale is the principal and immediate cause of the sale. It need not be the sole cause, and an agent is said to be the procuring cause of a sale when his acts have so contributed to bringing about the sale that but for his acts the sale would not have been accomplished.

6

> The fact that Mr. Perthuis was discharged by BMGL prior to the time a sale was completed does not bar his right to a commission if he was the procuring cause of the sale.

The charge asked, "Did BMGL fail to comply with the Employment Agreement regarding commissions?" The jury answered "Yes" as to four companies—Natera, Progenity, Fleury, and NIPT. The jury awarded Perthuis damages for each company: $889,726.43 for Natera, $69,702.12 for Progenity, $2,353.72 for Fleury, and $554.62 for NIPT.

The trial court rendered judgment based on the jury verdict. It ordered that Perthuis receive $962,336.89 as compensatory damages from Baylor Miraca, plus pre- and post-judgment interest. It did not award Perthuis any attorney's fees.

## Breach of the Commission Agreement

In its first issue, BMGL asserts that the trial court's charge was erroneous in that it improperly instructed the jury regarding the contract. BMGL asserts that the trial court erred in charging the jury that the parties' agreement unambiguously promised Perthuis commission on post-termination sales for which he was the "procuring cause." BMGL argues that the Employment Offer Letter, which contains the provision that Perthuis was entitled to a 3.5% commission on his net sales, unambiguously did not provide that he was entitled to a commission for sales that he "procured," nor did it promise commissions even after his employment with BMGL terminated.

7

## A.      Preservation

As a preliminary matter, Perthuis argues that BMGL did not make a timely and specific objection to the jury charge with the objections it now asserts on appeal. To preserve error in the charge, an objecting party must present to the trial court a complaint that distinctly designates the error and grounds for the objection. *See* TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 272, 274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). Objections to the charge must comport with the arguments made on appeal. *Cont'l Cas. Co v. Baker*, 355 S.W.3d 375, 383 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g).

At the charge conference, BMGL objected to the jury charge on numerous grounds. This included objections that "the instruction is inconsistent with the Employment Agreement's terms," that "the term 'procuring cause' does not appear in the Employment Agreement," that "the instruction purports to impose obligations on [BMGL] not contained in the Employment Agreement," and that "the instruction is a misstatement of the law that applies to the facts." These are specific objections that alerted the trial court that BMGL disputed both the trial court's construction of the commission provision in the Employment Offer Letter and the submission of the specific question to the jury. *See* TEX. R. CIV. P. 274 (providing that objections to charge must be specific); *Ledesma*, 242 S.W.3d at 43;

8

*Baker*, 355 S.W.3d at 383. We conclude that BMGL preserved its complaints for review on appeal.[1]

**B.      Construction of the Parties' Agreement and the Jury Charge**

Analysis of BMGL's first issue requires that we construe the parties' agreement. "In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012) (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). "We begin our analysis with the contract's express language." *Id.* at 805–06. "If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law." *Id.* at 806.

---

[1]      Perthuis further argues that BMGL did not make the trial court aware of its complaints regarding potential ambiguity in the Employment Offer Letter's terms regarding sales commissions and that BMGL did not "preserve its jury charge complaint through the alternate liability question that it requested." Because we do not address the alternative argument of BMGL's that the contract was ambiguous, we need not address Perthuis's contention that this argument was not preserved. We likewise note that BMGL was not required to submit a "substantially correct alternate question or instruction"—its specific objection was sufficient to preserve its complaint that this jury question was improper. *See* TEX. R. CIV. P. 274 (party objecting to charge must point out distinctly objectionable matter and grounds of objection); *id.* R. 278 (providing that party must submit substantially correct instruction to preserve error in *failing to submit* question or instruction, but objection alone is sufficient to preserve issue if instruction is relied upon by other party) (emphasis added).

9

Our resolution of BMGL's first issue also requires that we review the jury charge. We review a trial court's jury charge rulings for an abuse of discretion, *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 727 (Tex. 2016), though whether a definition in the charge misstates the law is a legal question that we review de novo. *Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 408 (Tex. 2016); *see also Hamid v. Lexus*, 369 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Whether the charge submits the controlling issue in the case, in terms of theories of recovery or defense, is a question of law which is reviewed de novo.").

The Employment Offer Letter offered Perthuis continued employment once the joint venture that created BMGL was finalized. In return for working as the Vice President of Sales and Marketing, BMGL would compensate him with an "annual base salary" of $145,000, and the Employment Offer Letter further provided that his "commission will be 3.5% of [his] net sales." There are no other terms included in the Employment Offer Letter relevant to sales commissions.

The terms of the commission agreement are sparse, but they are also clear.[2] Our goal in construing this agreement is to ascertain the parties' intent as expressed

---

[2] BMGL argues, in the alternative, that, if this Court concluded that the Employment Offer Letter was ambiguous, the trial court erred in refusing to submit to the jury a question regarding the intent of the parties. Because we conclude that the agreement was not ambiguous, we need not address these arguments. *See Tex. Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126

in the instrument. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757 (Tex. 2018). "'[O]bjective, not subjective, intent controls,' so the focus is on the words the parties chose to memorialize their agreement." *Id.* (footnote omitted). "[O]ur quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Id.* at 764.

The terms "commission" and "net sales" are not defined, so we interpret them according to their plain, ordinary, and generally accepted meaning. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) ("Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."); *Aflalo v. Harris*, 583 S.W.3d 236, 24 (Tex. App.—Dallas 2018, pet. denied) (en banc). The

---

(Tex. 2004) ("Whether a contract is ambiguous is itself a question of law."); *see also Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010) ("[A]n ambiguity does not exist simply because the parties interpret a [contract] differently.").

Both BMGL and Perthuis further point to extrinsic evidence regarding the meaning of the commission agreement. BMGL points to the nature of commissions paid to other sales people, and Perthuis asserts that "internal communications about Perthuis's commission agreement show that [BMGL] always knew and understood that it had agreed to pay him 3.5% of all business he recruited, 'permanently' and 'in perpetuity.'" However, because we have determined that the commission provision is not ambiguous, this evidence is not relevant here in determining the plain meaning of the parties' written agreement. *See, e.g.*, *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 765–67 (Tex. 2018) (holding that extrinsic evidence is admissible to settle ambiguity about intent embodied in contract's language; parole evidence rule prohibits extrinsic evidence of subjective intent that alters contract's terms but does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, contract text).

11

term commission, as used in this context, means "a fee paid to an agent or employee for transacting a piece of business or performing a service." *Commission*, MERRIAM-WEBSTER ONLINE DICTIONARY, www.merriam-webster.com/dictionary/commission (last visited November 19, 2020); *see also Aflalo*, 583 S.W.3d at 242 (courts "typically look[ ] first to dictionary definitions" to determine term's common, ordinary meaning when it is not defined in contract). A commission thus indicates a payment related to a specific sale or service.

The term "sales" or "net sales" can likewise be given a plain meaning and indicates that Perthuis's commission would be calculated from the value of any products or services he sold. *See, e.g.*, *Net Sales*, MERRIAM-WEBSTER ONLINE DICTIONARY, www.merriam-webster.com/dictionary/net%20sales (last visited November 19, 2020) (defining term as "the balance of gross sales remaining after deducting trade discounts, returned sales, and sales allowances"); *see also Boondoggles Corp. v. Yancey*, No. 01-05-00185-CV, 2006 WL 2192708, at *9 (Tex. App.—Houston [1st Dist.] Aug. 3, 2006, no pet.) (mem. op.) (concluding, in context of parties' service agreement, that "net sales" meant total sales minus sales taxes); *Gaston v. Flintlock Constr. Servs. of Tex., Inc.*, No. 07-00-0355-CV, 2001 WL 326865, at *2 n.3 (Tex. App.—Amarillo Apr. 4, 2001, pet. denied) (mem. op., not designated for publication) (holding that word "net" in calculating profit "connotes the difference between gross income or proceeds and the expense")

(citing *Wolfman v. J.D.R. Corp.*, 567 S.W.2d 235, 236 (Tex. App.—San Antonio 1978, no writ) (describing "net profits" as "gross contract proceeds less the cost to plaintiff in doing the work"). This is consistent with Perthuis's testimony that, prior to his termination, BMGL paid him commissions quarterly by determining the total value of his revenues, adjusting those revenues to account for unpaid billings, and then multiplied that number by his commission percentage.

Finally, in making a reasonable construction of a contract, we construe the agreement from a utilitarian standpoint bearing in mind the particular business activity sought to be served. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). Viewed in this light, the plain language of the commission agreement indicates that it was intended as compensation for Perthuis's continued employment with BMGL. The commission agreement was one provision contained within the Employment Offer Letter. In return for his work as the Vice President of Sales & Marketing, BMGL would pay Perthuis a salary and commission of 3.5% of his net sales. This is, again, consistent with Perthuis's testimony that he earned commissions based on sales—the revenue generated when tests were ordered, performed, and then billed to the correct accounts—and not when he procured potential buyers.

The trial court's charge states that Perthuis was entitled to commissions for sales, including sales that occurred after his termination, if he was the "procuring

13

cause" of the sale. Nothing in the parties' agreement, however, indicates that BMGL agreed to compensate him for sales from customers that he had "procured" even after Perthuis was no longer employed by BMGL. Nothing in the contract indicates that Perthuis was entitled to a commission for procuring channel partners or for negotiating Laboratory Services Agreements like the one with Natera. The provision for a 3.5% commission on net sales does not, as Perthuis claims, imply the creation of a perpetual annuity or other ongoing, "permanent" obligation that would continue after his employment terminated.

Perthuis argues that the "procuring cause" standard, frequently used in the context of real estate brokerage, is applicable here to determine what his commissions should have been. "'Procuring cause' is defined as 'the cause originating a series of events, which, without [a] break in their continuity, result in the accomplishment of the prime object.'" *Truman Arnold Cos. v. Hammond & Consultants Enters., Inc.*, No. 12–09–00099–CV, 2010 WL 2982912, at *8 (Tex. App.—Tyler July 30, 2010, no pet.) (mem. op.) (quoting BLACK'S LAW DICTIONARY 1208). "Thus, 'a broker will be regarded as the "procuring cause" of a sale, so as to be entitled to commission, if his or her efforts are the foundation on which the negotiations resulting in a sale are begun.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1208).

Perthuis points us to "well-established Texas law" providing that a broker's right to a commission does not hinge on his continued employment through the time of the final consummation of the purchase. *See, e.g.*, *Goodwin v. Gunter*, 185 S.W. 295, 296–97 (Tex. 1916); *Frady v. May*, 23 S.W.3d 558, 563 (Tex. App.—Fort Worth 2000, pet. denied); *Ramesh v. Johnson*, 681 S.W.2d 256, 258–59 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Perthuis further asserts that courts have applied this rule in other contexts besides real estate brokerage agreements. *See, e.g.*, *Frances v. Foster*, 260 S.W. 1023, 1023–24 (Tex. 1924); *Keener v. Cleveland*, 250 S.W. 151, 151–52 (Tex. 1924); *Metal Structures Corp. v. Bigham*, 347 S.W.2d 270, 273–74 (Tex. App.—Dallas 1961, writ ref'd n.r.e.).

We note, however, that each of the cases relied on by Perthuis involve contracts and circumstances that are different from the one we are asked to construe here. For example, in *Keener*, the supreme court held that a broker was entitled to a commission on the sale of an oil and gas lease when he procured the buyer that met the seller's terms, even though the broker did not negotiate the final sale himself. 250 S.W. at 151–52. The court stated,

> It is not necessary that the broker should negotiate the sale, when he has found, or procured, . . . a purchaser who is able, ready, and willing to purchase the property upon the terms named by the principal and the principal has entered into negotiations with such a purchaser, and concluded a sale with him, and in such cases the broker has performed his contract and is entitled to his commissions.

15

*Id.* at 152. The agreement at issue in *Keener* thus involved different terms and different business activities than those involved in Perthuis's commission agreement. *See Frost Nat'l Bank*, 165 S.W.3d at 312 (we construe contracts from utilitarian standpoint bearing in mind particular business activity sought to be served).

*Metal Structures Corporation* is likewise distinguishable. In that case, the salesman sought commissions for metal buildings that he had worked to design and sell to particular buyers, and when he was dismissed, his former employer asked him "to make a list of the jobs he had worked on and turn it over to the company." *Metal Structures Corp.*, 347 S.W.2d at 273. He was told that "he would be paid commissions on any of these jobs if the company was successful," and the "contract was subsequently made" for the sale of the particular building. *Id.* The court held that the salesman's discharge did not bar him from recovering the commission he had "already earned." *Id.* at 273–74. The parties in *Metal Structures Corp.* thus had an agreement that specifically addressed commissions on post-termination sales, and the definition of "procuring cause" was submitted without objection. *See id.* The court's holding in *Metal Structures* cannot reasonably be read to provide that a "procuring cause" standard applies to every contract for sales commissions.

Here, in contrast to the circumstances in *Keener* or *Metal Structures*, Perthuis and BMGL did not have an agreement for commissions on procuring certain types of buyers or for future sales that the salesman had begun but was unable to finish. The commission agreement provided that, as part of his compensation as an employee of BMGL, Perthuis would receive a salary and a commission of 3.5% of his net sales. At the time Perthuis was terminated, he was paid commissions for sales that were completed through his last day of employment. Any future sales had not yet occurred, and, thus, he could not have "already earned" a commission. *See id.*

Moreover, none of the authorities cited by Perthuis stand for the proposition that the "procuring cause" standard applies in determining all sales commissions. To the contrary, each of these cases was decided based on the terms of the parties' particular agreements. Perthuis is bound by the terms of his own written agreement with BMGL. Nothing in the language of the Employment Offer Letter indicated that the parties intended to pay commissions under a procuring-cause standard or that Perthuis was entitled to commissions based solely on the LSAs. Courts are not authorized to rewrite agreements to insert provisions parties could have included or to imply terms for which they have not bargained. *Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996); *see also HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) (holding that courts cannot make, or

17

remake, contracts for parties). The parties could have made an agreement by which Perthuis received commissions for finding buyers who were willing to enter into LSAs, independent of his continued employment with BMGL. They could have agreed to pay commission based on some other measure than "net sales," but they did not. They agreed instead for Perthuis to receive a commission of 3.5% of his net sales as part of his compensation as an employee of BMGL.

Accordingly, we agree with BMGL that the trial court's charge erroneously instructed the jury that Perthuis was entitled to commissions on sales for which he was a "procuring cause," including sales that had not yet occurred at the time Perthuis was terminated.[3] *See* TEX. R. CIV. P. 277 (providing that trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict"); *Seger*, 503 S.W.3d at 408 (for instruction to be proper, it must assist jury, accurately state law, and find support in pleadings and evidence).

## C.     Harm and Evidence of Breach

We have determined that an incorrect jury instruction was given. The error in the charge here related to a contested, critical issue—the interpretation of the commission agreement that Perthuis alleged was breached. *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (charge error is generally considered harmful if

---

[3]     Both parties provide extensive briefing regarding the reasons behind Perthuis termination. However, this is a breach-of-contract case, not a wrongful-termination case, and the reasons for BMGL's termination of Perthuis's at-will employment are irrelevant in construing the terms of his commission agreement.

it relates to contested, critical issue). The trial court erroneously allowed the jury to consider evidence of BMGL's sales that did not fall within Perthuis's Employment Offer Letter's provision for commission on net sales, and, thus, the error was harmful. *See* TEX. R. APP. P. 44.1(a)(1); *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006) (holding that incorrect instruction requires reversal if it was reasonably calculated to and probably did cause rendition of improper judgment).

BMGL further argues that Perthuis presented no evidence that it breached the commission agreement. We agree. The elements of a contract breach claim are (i) a valid contract, (ii) performance or tendered performance by the plaintiff, (iii) breach by the defendant, and (iv) damages sustained by the plaintiff as a result of that breach. *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 625 (Tex. App.—Dallas 2020, no pet.). Whether a party has breached a contract is a legal question for the court, not a fact question for the jury, if the facts of the parties' conduct are undisputed or conclusively established. *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010).

Here, the parties' conduct is not disputed. Perthuis himself acknowledged that he was paid commissions on his net sales through January 23, 2017, the day he was terminated. Perthuis does not identify any net sales prior to the termination of his employment for which he was not paid a commission. The parties disagree only

19

on whether BMGL was obligated to continue to pay commissions to Perthuis after his termination for sales made to channel partners procured by Perthuis. We have already concluded that the commission agreement did not require such payments.

We render judgment that Perthuis take nothing by his claims against BMGL. *See* TEX. R. APP. P. 43.3 ("When reversing a trial court's judgment, the court [of appeals] must render the judgment that the trial court should have rendered, except when: (a) a remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial."). Because none of BMGL's remaining issues can afford it any greater relief, we need not address its remaining contentions on appeal. *See* TEX. R. APP. P. 47.1.

## Attorney's Fees

In his cross-appeal, Perthuis argues that he was entitled to attorney's fees pursuant to Civil Practice and Remedies Code Chapter 38. However, such fees are available only to prevailing parties. *See* TEX. CIV. PRAC. & REM. CODE § 38.001 ("A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs. . . ."); *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."). Because we have rendered a take-nothing judgment against Perthuis, we conclude that he is not entitled to attorney's fees. *See Solis*, 951 S.W.2d at 390.

We overrule Perthuis's sole appellate issue.

## Conclusion

We reverse the judgment of the trial court and render judgment that Perthuis take nothing by his claims against BMGL.


Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.