**SHAMOUN & NORMAN, LLP, Appellant and Cross–Appellee**

**v.**

**Albert G. HILL, Jr., Appellee and Cross–Appellant**

**No. 05-13-01634-CV**

Court of Appeals of Texas, Dallas.

Opinion Filed January 26, 2016

understood at that time.

Charles T. Frazier, Jr., Daniel D. Tostrud, Jonathan J. Cunningham, William D. Cobb, Jr., Lindsey K. Wyrick, C. Gregory Shamoun, Melanie Plowman, Dallas, TX, Jennifer R. Josephson, Houston, TX, Douglas W. Alexander, Wallace Jefferson, Austin, TX, for appellants.

Joseph B. Morris, James C. Ho, Tom M. Dees III, Stewart H. Thomas, Rick Thompson, Andrew P. LeGrand, Sr., Michael L. Raiff, Dallas, TX, Broadus A. Spivey, Austin, TX, for appellees.

Before Justices Bridges, Francis, and Myers

## OPINION

Opinion by Justice Bridges

This case involves the settlement of lawsuits involving Albert G. Hill Jr. ("Hill"), his son, other family members, family trusts, and business entities. Following a ten-day jury trial, the jury awarded Shamoun & Norman, LLP ("S & N") $7,250,000 in attorney's fees under the theory of quantum meruit for the reasonable value of services it rendered to settle those suits. The trial court, however, set aside the jury's findings and rendered a take-nothing judgment in Hill's favor.

For the reasons set out below, we reverse the trial court's judgment as to S & N's quantum meruit claim and render judgment reinstating the jury's $7,250,000 verdict. We reverse the trial court's judgment as to attorney's fees and remand to the trial court for a determination of S & N's reasonable and necessary attorney's fees in prosecuting the quantum meruit claim. In all other aspects, the judgment of the trial court is affirmed.

### Background

From 2007 through 2010, Hill was embroiled in a series of lawsuits involving his son, Albert G. Hill III ("Hill III"), other family members, family trusts, trustees, and business entities. By March 2009, the litigation included over twenty lawsuits in multiple courts with multiple parties, and over a hundred lawyers representing different individuals and entities. These lawsuits became known as the "spider web of litigation" and were described by one attorney "as intense as anything I've ever done in my practice." Although the par-

ties engaged in some settlement discussions during this time, no resolution was reached.

Before 2009, S & N had no role in any of the Hill litigation. Then, Hill's long-time personal attorney, Frances Wright, recommended hiring Gregory Shamoun ("Shamoun") and S & N for two specific cases. Hill and Shamoun signed limited fee agreements for S & N's representation in what the parties refer to as the "Abbott Financial" case (signed November 19, 2009) and the "Bordeaux Trust" case (signed January 15, 2010). Hill was pleased with Shamoun's work on these two cases.

In March 2010, Hill faced an impending trial date in federal court in what the parties refer to as the "RICO case." That case involved Hill III accusing Hill, other family members, and trustees of racketeering and of withdrawing and improperly distributing millions of dollars from family trusts, specifically the Margaret Hill Trust Estate ("MHTE") and the Haroldson Lafayette Hunt Jr. Trust Estate ("HHTE"). Hill III sought more than $1 billion in damages.

In addition to the looming trial date, Hill also faced another complication—previous sanctions by the federal judge for intentionally lying under oath and committing fraud on the court. After the federal court ordered sanctions, effective negotiations shut down for a period of time because both sides were focused on the ramifications of the order. Wright and Hill then began discussing the possibility of hiring Shamoun to act as global settlement negotiations counsel. Hill's side believed someone was leaking information to Steve Malouf, Hill III's lead attorney, and hindering settlement discussions, prompting the need for one unifying voice to negotiate with Malouf. So, on March 5, 2010, Wright asked Shamoun to attend a meeting with all the lawyers for the trusts, trustees, Hill's sisters, and children because they wanted to find a person "who could be one voice for the group to help get their camp in order." Although Shamoun did not become global settlement negotiations counsel at this time, he began settlement conversations with Malouf.

According to Malouf, negotiations became "very active" once Shamoun started working for Hill. Malouf said Shamoun reenergized the settlement discussions. Malouf believed Hill would be well served by having new, independent counsel as opposed to those who had previously surrounded him and might not have been looking out for his best interest.

According to Hill, sometime in the beginning of March, Shamoun asked him about a possible discretionary bonus. Hill viewed the discretionary bonus as giving him sole discretion to determine if Shamoun was entitled to any bonus, which meant Shamoun's performance in achieving a positive outcome was irrelevant.

During this time, Shamoun offered Malouf's clients $55 million to settle. On March 23, 2010, Malouf responded by email, "We have no interest in any further settlement discussions with [Hill] at this time. We need to prepare for trial. Sorry it didn't work out." According to Shamoun, settlement discussions had completely broken down. Malouf sent another email on March 27, 2010, reiterating his lack of interest in settlement and stating he wanted the jury to decide the RICO case.

Later that night, Wright called Shamoun. Wright informed Shamoun that Hill wanted him to get involved in the RICO case and work towards a global resolution before the RICO case went to trial on May 10, 2010. Shamoun declined involvement in the RICO case, but agreed to assist Hill in working towards a "global resolution"

because Shamoun knew Hill did not want to go to trial in May. Shamoun told Wright he would offer Malouf $73 million, if necessary, to settle.

Also during the conversation, Wright, on behalf of Hill, offered an "incentive bonus" in which Shamoun would receive fifty percent of any settlement above the difference between $55 million and $73 million. Shamoun understood the agreement to mean Hill retained the other fifty percent of any amount saved.

After Shamoun finished his conversation with Wright, he called Malouf. Malouf again said he had no interest in settlement.

Shamoun then called Hill, who again emphasized his desire for a global resolution of all the cases in the "spider web." Shamoun accepted the terms of Hill's offer, knowing that if he settled the "spider web" for $73 million or more he would receive nothing for his work. Shamoun also said Hill did not want anyone else in his "camp," which included Keith Benedict (Hill's general counsel at A.G. Hill Partners, LLC) and Tyler Miller (president of A.G. Hill Partners, LLC), to know about Shamoun's settlement authority and the bonus structure. It was important Shamoun be the "one voice" for Hill's side because Hill was suspicious someone was leaking information to Hill III, which was hindering settlement talks. According to Shamoun, he began working towards a global settlement on March 27, 2010.

In early April 2010, Shamoun changed his stance on the RICO case and entered into two limited fee agreements, dated April 12 and 13, to represent Hill. On April 30, while meeting at the courthouse, Shamoun reminded Hill not to forget about their bonus arrangement, and Hill said he would

not forget. Hill recalled this conversation and thought it was "odd." Over that weekend, Shamoun continued to work towards reaching a global resolution.

On Sunday, May 2, Wright made an unannounced visit to Hill's home and presented him with a document titled "Performance Incentive Bonus." She admitted she waited until May to draft it and said Shamoun did not assist her. The document memorialized Hill's and S & N's agreed bonus payment terms if Shamoun obtained a global settlement. However, the document included additional language that any amount "shall be split 50/50 between Law Offices of Frances Johnson Wright, P.C. and Shamoun and Norman."[1] Hill refused to sign the document because he did not recognize it or understand the terms after he "glanced" at it. Hill said Wright had never in her eighteen years working for him asked for a bonus. Hill then told Wright she needed to talk with Miller about the situation, and she left.

Even though Hill had decided not to sign the agreement, Hill faxed the document to Miller and Benedict within a couple of hours so they would "be aware of it." Benedict confirmed receiving the fax from Hill on May 2 and said he was "shocked by it" and did not know "what to think." He had never seen the performance incentive bonus or heard anything about it. Benedict did not believe it was anything Hill would agree to, and he said it was a "very difficult" document to understand. Benedict called Miller to discuss the document, and Miller decided they needed to set up a meeting with Wright to investigate.

Miller, Benedict, and Wright met on May 4. Miller explained to Wright that the incentive bonus offered to S & N was discretionary and that the other fifty per-

---

1. The agreement specifically stated, "The performance incentive bonus shall be calculated as the delta between $55 million and $73 million, and shall be split 50/50 between Law Offices of Frances Johnson Wright, P.C. and Shamoun and Norman."

cent went to Hill and was never meant for her. Wright disagreed and said the document had previously been agreed to by Hill. When Wright said she would talk to Hill about it, Miller told her not to call or communicate with Hill. Benedict left the meeting thinking Wright and Shamoun worked together to draft the document and to present it to Hill for his signature.

Following Wright's conversation with Miller, she sent a fax to Hill stating the following:

> Al, I had a very *unpleasant* conversation with Ty Miller this evening.
>
> What does discretionary bonus mean?
>
> I thought we were doing everything humanly possible and incentivizing to catch the rabbit, and his comments were symptomatic of something that confounds me.

Hill never responded to this fax, nor did he speak to Wright again. After Miller's conversation with Wright, Miller recommended that Hill terminate her services immediately.

Earlier that same day, Shamoun met with other attorneys for a settlement conference. Shamoun discussed Hill's global settlement terms with Hill III's attorney, Charla Aldous. Shamoun made sure all the terms of Hill's offer were discussed. Aldous said the terms included, but were not limited to, vacating certain orders from the federal lawsuit and settling the "spider web" of litigation. Aldous admitted no settlement documents were signed on May 4, but all parties were ordered back to court on May 5 for mediation. Shamoun was fairly certain the settlement terms would then be read into the record, memorializing the global settlement, and making it binding. Shamoun also discussed the bonus agreement again with Hill and told him not to have selective memory. Hill responded, "Trust me."

At some point during the afternoon of May 4 Shamoun learned about Wright's previous visit with Hill, her attempts to get him to sign the incentive bonus agreement, and Hill's refusal to sign it. Shamoun was concerned about the situation because the final terms of the settlement would be memorialized the next day.

Shamoun called Hill later that day and recorded the conversation. In the conversation, Hill denied offering to split any amount below the $73 million threshold. Hill said a deal was not off the table, but added they needed "to make a deal that is understandable and reasonable. You know, that has some relevance and makes sense." Hill provided Shamoun with Miller's phone number so Shamoun could call Miller directly and discuss the situation. Shamoun called Miller and explained his understanding of the agreement. After their conversation, Miller recommended to Hill that he terminate S & N's services other than preparing for the RICO trial.

Later that night, Shamoun had another conversation with Hill, but Shamoun denied that Hill fired him as settlement counsel or told him not to attend mediation the following day. In fact, Shamoun continued working and sending text messages to Miller hours before mediation. One text to Miller said, "if u hav any? ? Before the conf let me know." Hill, however, said he told Shamoun during the conversation that Benedict would be representing him the next day at the settlement conference. Although Hill admitted he did not tell Shamoun directly he was fired or that he no longer had any kind of settlement authority, Hill thought it "went without saying."

Miller fired Wright in the courtroom on May 5 before the mediation started. Shamoun attended the morning part of the mediation, but eventually left because he believed his time would be better utilized continuing to prepare for the RICO trial.

Before leaving the mediation, Shamoun texted Miller, "If Al thinks settlement is 100% surety I can stop the march now. If only 99% I must march. Plez advice asap." Shamoun continued to check in with Miller and Benedict throughout the day and, around 6 p.m., he learned the global settlement was finalized.

The parties disagree as to who negotiated the final settlement. Malouf and Aldous both testified the settlement terms Shamoun discussed with them prior to and on May 4 ended up in the final settlement read into the record on May 5 and signed by all parties on May 13. In fact, Malouf said nothing new arose on May 13.

Hill's evidence showed otherwise. Magistrate Judge Paul Stickney, Hill, and Benedict testified Shamoun did not negotiate and settle the "spider web" on May 5.

Magistrate Judge Stickney, who conducted the mediation on May 5, said Shamoun did not participate in any of the mediation on May 5, and Shamoun told him he no longer represented Hill. Magistrate Judge Stickney said when the mediation started on May 5, none of the terms of the settlement agreement had been agreed upon. He described the day as "pretty intense," but at the end, the parties expressed their intent to settle. Although Magistrate Judge Stickney agreed he met with some of the attorneys on May 4, he denied that the dispute settled on that day or that the parties agreed to any of the settlement terms. Magistrate Judge Stickney testified Benedict was the lawyer primarily responsible for negotiating the settlement for Hill. Several trustees likewise agreed that Shamoun was not present on May 5 and that Benedict negotiated the terms of the settlement. However, Magistrate Judge Stickney and the trustees admitted they did not know what Shamoun,

Malouf, and Aldous discussed for the six weeks leading up to the mediation.

Hill testified he fired Shamoun on May 4, and Benedict took over as lead counsel for him during the May 5 mediation. According to Benedict, he negotiated every point during the May 5 mediation that resulted in the final agreement.

The final global settlement agreement and mutual release was later filed under seal with the federal court. It remains under seal.

On August 16, 2010, S & N sent a demand letter to Hill for $11,250,000, an amount representing its fifty percent of the incentive bonus. Hill refused to pay. S & N then filed suit against Hill for breach of contract, fraud, fraudulent inducement, quantum meruit, quasi-estoppel, exemplary damages, and various causes of action against Benedict, Miller, and AG Hill Partners, LLC.[2] Hill filed counterclaims for breach of fiduciary duty, breach of contract, and civil conspiracy against Shamoun and S & N. Prior to trial, the court granted Hill's motion for partial summary judgment on S & N's breach of contract claim and quasi-estoppel counterdefense, and S & N abandoned its conspiracy claim against Hill.

The case went to trial on S & N's quantum meruit, fraud, and fraudulent inducement claims and Hill's counterclaims against S & N for breach of contract and against Shamoun for breach of fiduciary duty and civil conspiracy. At the close of S & N's evidence, the trial court granted Hill's motion for directed verdict on S & N's fraud and fraudulent inducement claims, but denied his motion for directed verdict on quantum meruit.

At the conclusion of all evidence, the jury found in favor of S & N. Specifically, the jury determined S & N provided com-

---

**2.** Shamoun later dropped his claims against Benedict, Miller, and AG Hill Partners, LLC.

pensable global settlement services for Hill, found the reasonable value of its services was $7,250,000, but did not award S & N attorney's fees for prosecuting its claim. The jury found in favor of Shamoun and S & N on all of Hill's counter-claims.

Hill filed a motion for the trial court to "determine appropriate equitable relief" and to disregard the jury's quantum meru-it findings. In the motion, he argued three independent reasons for setting aside the jury's findings: (1) the agreement violated the statute of frauds; (2) the award violated equitable and constitutional protections against excessive awards; and (3) quantum meruit is not available for work performed under a preexisting contract and S & N failed to segregate the work done under the contracts from that not done under the contracts. S & N, in turn, filed a motion to disregard the jury's $0 award of attorney's fees.

After extensive briefing and a hearing on the arguments, the trial court granted Hill's motion and set aside the jury's quantum meruit findings. S & N's motion to recover attorney's fees was thereby mooted. Despite S & N's requests, the trial court did not enter findings of fact or conclusions of law to support its decision to disregard the jury's findings. This appeal followed.

### Issues Raised on Appeal

S & N raises four issues on appeal:

1. Did the trial court err in disregarding the jury's answers to Questions 1 and 2 of the charge and rendering a take-nothing judgment after the jury found S & N rendered compensable global settlement services with a reasonable value of $7.25 million?

2. If this Court reverses and renders judgment in favor of S & N, then did S & N prove, as a matter of law, its rea-sonable and necessary attorney's fees incurred in prosecuting its quantum meruit claim such that this Court can render judgment on the fees proven? Or, alternatively, is S & N entitled to a new trial on its attorney's fees?

3. If the trial court did not err in disregarding the jury's findings, did it err by granting a pre-trial partial summary judgment against S & N on its quasi-estoppel counter-defense and breach of contract claim against Hill?

4. Did the trial court err by refusing to state its reasons for disregarding the jury's quantum meruit findings and refusing to make findings of fact and conclusions of law?

Hill raises four conditional cross-points:

1. Did the trial court err by allowing the expert testimony of Richard Sayles?

2. Did the trial court err by failing to instruct the jury on segregation?

3. Did the trial court err by limiting the scope of fiduciary duty in the jury charge?

4. Did the trial court err by denying any relief for S & N's spoliation of evidence?

For clarity, because some of Hill's conditional cross-points are intertwined with S & N's issues, we address them together in the analysis sections below.

### Applicability of Texas Government Code Section 82.065

■ Before addressing whether the evidence is legally sufficient to support the jury's finding S & N provided compensable global settlement services, we must first consider Hill's arguments that the jury findings are immaterial because section 82.065 of the government code bars relief as a matter of law as to an oral contingency fee agreement.

■ Section 82.065 can be "sensibly construed to operate in a manner similar to the statute of frauds." *Enochs v. Brown,* 872 S.W.2d 312, 318 (Tex.App.—Austin 1994, no writ), *disapproved of on other grounds by Roberts v. Williamson,* 111 S.W.3d 113 (Tex.2003). Hill asserts Shamoun is attempting to "use quantum meruit to resurrect an oral contingency agreement that violates the statute of frauds." He relies on the language of section 82.065(a), which provides, "A contingent fee contract for legal services must be in writing and signed by the attorney and client." TEX. GOV'T CODE ANN. § 82.065(a) (West Supp.2015). However, Hill ignores subsection (c), which specifically states, "An attorney who was paid or owed fees or expenses under a contract that is voided under this section may recover fees and expenses based on a quantum meruit theory...." *Id.* § 82.065(c). Thus, if a contract between parties is void, meaning it has no legal effect because it was not in writing under section 82.065(a), an attorney may still recover his fees owed under quantum meruit. While we agree the statute of frauds generally applies to "prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in writing and signed by the party to be charged with the agreement," based on the language of section 82.065(c), we disagree with Hill's assertion that an agreement that violates the statute of frauds cannot be used to support a quantum meruit claim.

We find support for our conclusion in *Enochs v. Brown,* 872 S.W.2d 312, 321 (Tex.App.—Austin 1994, no writ), *disapproved of on other grounds by Roberts v. Williamson,* 111 S.W.3d 113 (Tex.2003), in which the appellate court concluded that despite a client and attorney failing to enter into a valid fee agreement pursuant to section 82.065(a), the evidence presented supported the trial court's award of such fees based on quantum meruit. *Id.* Hill argues we should not be persuaded by this "single ruling" because in *Enochs,* the client signed the contract and the attorney did not. Hill contends the *Enochs* court "simply held that the client could not negate an agreement on the ground that the *attorney* had not signed the agreement." Although the court heavily weighted this factor in its section 82.065(a) analysis by concluding the section's purpose was accomplished because the client's signature indicated an understanding of the fee arrangement, the court's analysis did not end there. *Id.* at 319. Rather, the court went on to consider the trial court's conclusion of law that if there was no contract between the parties, then the attorney established a right to recover under quantum meruit. *Id.* at 320. The court concluded each element of quantum meruit was supported by the evidence and affirmed the attorney's fee award. *Id.* at 321. Accordingly, *Enochs* supports the conclusion that an attorney may recover under the theory of quantum meruit for fees based on an oral contingency fee agreement when a party presents sufficient evidence in support of the award.

Three cases relied on by Hill are inapposite. In two of the cases, the court determined the plaintiff produced no evidence of the value of services to support a quantum meruit award. *See Green Garden Packaging Co. v. Schoenmann Produce Co.,* No. 01–09–00924–CV, 2010 WL 4395448, at *7 (Tex.App.—Houston [1st Dist.] Nov. 4, 2010, no pet.) (mem.op.); *Ray v. T.D.,* No. 03–06–00242–CV, 2008 WL 341490, at *8 (Tex.App.—Austin Feb. 7, 2008, no pet.) (mem.op.) ("In the absence of any attempt by [attorney] to quantify the value of any legal services he provided [client] beyond his bare reliance on a claimed contingent-fee percentage, the district court did not abuse its discretion in refusing to

award [attorney] attorney's fees under quantum meruit."). In the third case, the majority addressed the jury's quantum meruit finding only to the extent it involved a statute of limitations question and, therefore, remanded for consideration of this and other issues. *Quigley v. Bennett,* 227 S.W.3d 51, 54 (Tex.2007). *But see id.* at 54 (Brister, J., dissenting) (agreeing with majority that fraud finding must be set aside under statute of frauds but stating "there is no reason to set aside the jury's quantum meruit verdict"). Thus, none of these cases concluded section 82.065 bars relief on an oral contingency fee agreement.

Accordingly, Hill has failed to provide any relevant authority to support his position that an attorney is foreclosed from recovering under quantum meruit when the basis for recovery is an oral contingency fee agreement. Instead, case law supports such a recovery if a party provides sufficient evidence to support the value of the reasonable services provided. Thus, as a matter of law, the trial court could not have granted Hill's motion to disregard the jury's findings because the verdict conflicts with section 82.065.

We now consider whether the evidence is legally sufficient to support the jury's quantum meruit findings.

### Sufficiency of the Evidence to Support the Jury's Finding S & N Provided Valuable Compensable Global Settlement Services

In its first issue, S & N argues the trial court erred in disregarding the jury's findings that S & N rendered compensable global settlement services to Hill with a reasonable value of $7,250,000. The jury was asked the following:

**Question No. 1**

Did Shamoun & Norman, LLP perform compensable global settlement services for Albert G. Hill, Jr.?

One party performs compensable global settlement services if such services are valuable services and are rendered for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the services.

Answer "Yes" or "No."

Answer:__Yes__

**Question No. 2**

What is the reasonable value of such compensable services at the time and place they were performed?

Answer in dollars and cents, if any.

Answer:___$7,250,000___

A trial court may disregard a jury's finding only when the answer has no support in the evidence or the question is immaterial. *See Shell Oil Prods. Co. v. Main St. Ventures, L.L.C.,* 90 S.W.3d 375, 387 (Tex.App.—Dallas 2002, pet. dism'd by agr.). Thus, a trial court can disregard a jury's finding when there is a complete absence of evidence of a vital fact, the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). We review the trial court's determination under a legal sufficiency review, considering only the evidence and reasonable inferences that support the findings and rejecting all evidence and inferences to the contrary. *Id.* Where some evidence supports the disregarded finding, the reviewing court must reverse and render judgment on the verdict. *Basin Operating Co. v. Valley Steel*

*Prods. Co.*, 620 S.W.2d 773, 776 (Tex.Civ. App.—Dallas 1981, writ ref'd n.r.e.).

Quantum meruit is an equitable remedy that does not arise out of contract but is independent of it. *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex.1990). Generally, a party may recover under quantum meruit only where there is no express contract covering the services or materials furnished. *Id.* To recover under quantum meruit, a claimant must prove (1) the valuable services rendered or materials furnished, (2) to the person sought to be charged, (3) which services or materials were accepted, used, and enjoyed by that person, (4) under such circumstances as reasonably notified the person sought to be charged that plaintiff was expecting to be paid. *Id.* The measure of damages for a quantum meruit claim is the reasonable value of the work or services performed. *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 796 (Tex.App.—Dallas 2007, no pet.).

In his motion to disregard jury findings, Hill argued S & N failed to present evidence of compensable work not already subject to compensation under preexisting, enforceable contracts. On appeal, S & N contends, as a matter of law, the limited-engagement contracts did not cover S & N's services for achieving the global settlement. Moreover, S & N asserts the evidence is legally sufficient to support the jury's conclusion it provided services outside the scope of the limited-engagement contracts; therefore, the trial court erred if it disregarded the jury's finding on this basis.

We begin by determining whether the limited-engagement contracts encompassed S & N's global settlement services. Both parties agree quantum meruit is not available for services covered by an existing contract. *See Vortt Expl. Co.*, 787 S.W.2d at 944. However, quantum meruit does not preclude recovery for the reasonable value of work performed, but not covered, by a contract. *See Jensen Constr. Co. v. Dallas Cty.*, 920 S.W.2d 761, 774 (Tex.App.—Dallas, 1996, writ denied), *disapproved of on other grounds by Travis Cty. v. Pelzel & Assocs.*, 77 S.W.3d 246 (Tex.2002).

The court decides the legal question of whether an express contract covers the services at issue. *See Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724 (Tex.App.—Houston [1st Dist.] 2011, no pet.). Thus, it is reviewed de novo. *Id.* To determine if the contracts required the work, we must determine whether (1) the work was extra and (2) the contract made provision for the type of extra work performed. *See Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex.1976), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989).

Here, four agreements are at issue: (1) the November 19, 2009 "limited agreement" of S & N to represent Abbott Financial, LLC "relative to the collection of the debt under the Guaranty dated December 22, 2006"; (2) the January 15, 2010 "limited engagement" of S & N to provide legal services relative to certain litigation matters styled *Albert G. Hill, Jr. v. Erin Nance Hill, Individually and as Trustee of the Hill Family Trust, et al.*; (3) the April 12, 2010 "limited engagement" of S & N to provide legal services in certain litigation matters styled *In re Estate of Margaret Hunt Trust Estate*; and (4) the April 13, 2010 "limited engagement" of S & N to provide legal services relative to certain litigation matters styled *In re Estate of Margaret Hunt Trust Estate* and *Albert G. Hill, III v. Tom Hunt, et al.*

Each of these engagement letters states it is not general in nature, but is limited to

the "[e]ngagement, as defined above." Each letter then identifies a specific cause of action as the engagement. Although the engagement letters contain language requiring S & N to provide reasonable and necessary legal services "including, without limitation ... drafting ... correspondence ... attending mediation and trial; and drafting settlement documents," we reject Hill's contention that this language "clearly encompasses Shamoun's purported global settlement services." Rather, we conclude such language merely refers to the legal services S & N agreed to provide for each specific cause of action. Nothing within the language of these four engagement letters provided S & N with authority to provide any type of legal services for the "spider web" settled as part of the global settlement, which included over twenty different lawsuits. Thus, as a matter of law, the plain language of the agreements establishes that S & N's services in negotiating the global settlement constituted extra work, which the four engagement letters did not cover. Accordingly, the trial court could not have granted Hill's motion to disregard jury findings because the global settlement services were covered by existing contracts.

We now consider whether the evidence was legally sufficient to support the jury's finding that S & N performed compensable global settlement services for Hill. *See Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 70 (Tex.App.—Houston [1st Dist.] 2011, no pet.) ("When the evidence shows that no contract covers the services at issue, *then* the question of whether a party may recover in quantum meruit is for the trier of fact."). The jury was instructed, "One party performs compensable global settlement services if such services are valuable services and are rendered for another party who knowingly accepts and uses them

and if the party accepting them should know that the performing party expects to be paid for the services."

Shamoun estimated Hill had about 100 lawyers working on the "spider web." In February 2010, he did not perceive any coordinated strategy to resolve all the cases. He became the "one man" providing the voice for Hill, and Shamoun worked to gain the trust of Malouf and to build a rapport with the other attorneys representing Hill III. Shamoun had to understand and work within the family dynamic because "[w]hen you're trying to negotiate family duties with brothers and sisters and aunts and uncles and a family dispute it takes on its own dynamic." As early as March 30, 2010, Malouf acknowledged the value of Shamoun joining Hill's legal team in an email in which he said, "This may settle. If it does, it will be because of your efforts. Do they understand that?"

Shamoun testified the global settlement services he provided included settling and obtaining releases of a "sundry of cases." He resolved all litigation among family members and obtained releases of law firms, accounting firms, and other potential parties. The settlement vacated the order in Hill III's federal RICO case in which the trial court sanctioned Hill for filing a false affidavit, which further helped Hill avoid a billion-dollar suit. In addition, Hill saved millions in estate taxes based on settlement of trust issues and received exclusive control of a $1 billion trust.

Shamoun did not doubt Hill's request to achieve a settlement was broader than his work on the Bordeaux Trust and Abbott Financial cases, particularly because Hill and Shamoun entered into those limited engagements prior to any global settlement discussions. Likewise, the limited fee agreements for the RICO case did not cover his global settlement services be-

cause Hill and Shamoun did not enter into those until after Shamoun was hired as global settlement counsel.

Further, the jury heard numerous witnesses, including Shamoun, testify to the importance of a global resolution of the "spider web." Magistrate Judge Stickney said there was not an effort to settle the individual cases because global settlement was "what we always wanted." Richard Sayles, Shamoun's expert, testified one case could not be "plucked out of a basket" and settled because the intent of the parties was a global settlement or no settlement. Sayles emphasized that Shamoun took on tasks and responsibilities beyond the limited engagement agreements, and Shamoun's services as global settlement counsel were not compensated by the hourly fees he received for his work under those agreements.[3]

The record also shows Hill did not discourage Shamoun from working towards global settlement even after he received a copy of the performance incentive bonus agreement, which Hill testified he never intended to sign. Rather, Hill said he did not expect the cases to settle before the parties returned to mediation on May 5.

Hill also took advantage of Shamoun's services by allowing Shamoun to attend the settlement conference on May 4. Shamoun had repeatedly reminded Hill of their agreement; however, Hill testified, "He knew it had not been signed, not been agreed to," but again, it was simply "part of his job."

Aldous testified that during the May 4 conference, she and Shamoun discussed terms of the settlement agreement. She explained the discussed terms were Hill's terms necessary for global resolution, and those terms ended up in the May 13 final settlement.

Malouf testified that up until May 1, 2010, when he had to go to trial in another lawsuit, he and Shamoun were the only ones from either side engaged in settlement discussions. Malouf testified the May 1 discussion was the "genesis of the settlement." Malouf explained that the terms in the papers before the court on May 13 were the terms the parties agreed upon on May 4 and May 5 and "the genesis of those terms was the discussions I had had with Mr. Shamoun."

Finally, Sayles testified that the most difficult hurdles Shamoun faced in achieving settlement were being up against formidable opposition, preparing for a federal racketeering case if settlement did not occur (particularly with a sanctions order against Hill), navigating the family dynamic, and trying to present a consistent message with so many family opinions involved.

After reviewing the record in the light most favorable to the jury's finding, we conclude S & N presented more than a mere scintilla of evidence to support the jury's finding that it provided Hill valuable compensable global settlement services. Accordingly, the trial court could not have granted Hill's motion to disregard jury finding number 1 because of insufficient evidence.

Next, we consider whether S & N provided legally sufficient evidence to support the jury's $7,250,000 award for the reasonable value of its services. Because it impacts our analysis of this issue, we start with Hill's first conditional cross-point in which he asserts the trial court erred in allowing Sayles to testify as an expert on the alleged reasonable value of Shamoun's services without requiring him to segregate between compensable and

3. Hill paid Shamoun over $900,000 in fees under the limited engagement agreements.

non-compensable services. Hill argues Sayles "double dipped" because, in reaching his opinion, he considered the value of the entire global settlement rather than segregating out S & N's services covered by existing contracts. Thus, Hill asserts Sayles's opinion was unreliable.

The admission or exclusion of expert testimony is within the trial court's discretion and is reviewed for an abuse of discretion. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Jarrell v. Park Cities Carpet & Upholstery Cleaning, Inc.*, 53 S.W.3d 901, 902 (Tex.App.—Dallas 2001, pet. denied). Under rule 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX.R. EVID. 702. The proponent of the expert testimony bears the burden of showing that two tests have been met: (1) the expert must be qualified, and (2) the testimony must be relevant and based on a reliable foundation. *Robinson*, 923 S.W.2d at 556; *Moreno v. Ingram*, 454 S.W.3d 186, 193 (Tex. App.—Dallas 2014, no pet.).

Hill did not challenge Sayles's opinion based on qualifications, relevance, or that there was too great an analytical gap. Rather, Hill argued Sayles's opinion was not reliable because it was "contrary to established law"—specifically, that a party may not recover under quantum meruit for work performed under an existing contract. As evidence, he directs us to the following excerpt from Sayles's deposition:

Q: Now, you—do you agree that Shamoun cannot base any portion of his quantum meruit claim on any services covered by the signed engagement contract?

A: I do not agree.

Q: Okay. And you believe that Shamoun can base a portion of his quantum meruit claim on services covered by the signed engagement contracts, correct?

A: Yes, only because it was rolled into a global context.

After reviewing and considering the above testimony in the context of Sayles's testimony as a whole, we cannot agree his opinion is contrary to law. When asked if he believed the quantum meruit claim could be based on services specifically covered by a signed engagement, Sayles repeatedly stated that although some services may have "touched upon" a signed agreement, the goal was not to settle any one discrete matter. Rather, there could only be a global settlement. Sayles recognized Hill hired S & N to settle multiple cases; therefore, "in the context of this case," Sayles said S & N could recover under quantum meruit for settling cases subject to a signed engagement contract. But Sayles's opinion was based on his assumption that the global settlement services S & N provided were not covered by written fee agreements.

Sayles made it clear he understood the theory of quantum meruit when the following exchanges occurred:

Q: Do you agree that Shamoun is not entitled to recover under a [sic] quantum meruit for services performed under the signed contract?

A: Standing alone in isolation, I agree with you. . . .

A: I think the law is if he has a signed enforceable contract, he can recover under the contract, if for some reason or another the contract is not enforceable, th[en] he can recover the reasonable value of his services in quantum meruit.

In short, Sayles acknowledged S & N was not entitled to recover under quantum me-

ruit for work specifically covered by a signed fee agreement. However, if a contract was unenforceable, then S & N could recover the reasonable value of its services in quantum meruit. Additionally, Sayles stated in his affidavit in support of his expert opinion that he was aware of three discrete fee agreements for limited representation, but the "global settlement services rendered by Shamoun & Norman, LLP and accepted by [Hill] were not covered by those agreements, and were not charged for or paid for under those agreements."

We conclude Sayles's opinion was not contrary to the well-established law of quantum meruit. Rather, as S & N argues, Hill's challenge to Sayles's opinion is a disagreement about the scope of the global settlement services provided by S & N, which is a factual dispute, not a challenge to the reliability of Sayles's opinion based on a misunderstanding of the law. Such factual disputes are best left to the jury, which determines the weight to be given an expert and weighs conflicting opinions presented. *See Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary, L.P.*, 411 S.W.3d 1, 15 (Tex.App.—Dallas 2013, no pet.). Accordingly, the trial court did not abuse its discretion by overruling Hill's challenge to the admissibility of Sayles's opinion regarding the reasonable value of S & N's services. Hill's first conditional cross-point is overruled.

■ We now turn to whether S & N provided legally sufficient evidence to support the jury's $7,250,000 award. In his motion to disregard jury findings, Hill argued, as he does on appeal, that the jury's award is grossly excessive, breaking it down to an hourly rate of $48,000. S & N argues Hill failed to raise this sufficiency challenge to the trial court and, alternatively, it presented legally sufficient evidence to support the award.

We begin with S & N's waiver argument. In Hill's motion to disregard jury findings, he argued the jury's award must be "reasonable and necessary" and that S & N presented no evidence permitting the jury to value any of the compensable work apart from the signed agreements. S & N argued in its response motion that more than sufficient evidence supported the jury's reasonable value finding. Thus, the record indicates both parties were aware of a sufficiency challenge. As such, we agree Hill raised a sufficiency challenge to the trial court and, therefore, the issue is properly before this Court.

■ As previously stated, the measure of damages for a quantum meruit claim is the reasonable value of the work performed. *See Lamajak, Inc.*, 230 S.W.3d at 796. The jury has discretion to award damages within the range of evidence presented at trial. *Id.* "What constitutes a reasonable compensation for benefits furnished does not depend on any single factor, but takes into account all the evidence and circumstances." *See Walker & Assocs. Surveying, Inc. v. Roberts*, 306 S.W.3d 839, 859 (Tex.App.—Texarkana 2010, no pet.).

■ The jury charge did not define "reasonable value." Hill did not object to the lack of a definition in the jury charge or request an instruction defining it. When neither party objects to a question or instruction, the sufficiency of the evidence is measured against the charge given. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex.2000); *Oliva v. Davila*, 373 S.W.3d 94, 101 (Tex.App.—San Antonio 2011, pet. denied). Because Hill did not object or request a definition of "reasonable value," we review the sufficiency of the evidence against the commonly understood meaning of the words. *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 807

(Tex.App.—Dallas 2011, no pet.); *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 869 (Tex.App.—Dallas 2008, no pet.). "Reasonable" is commonly defined as "being in agreement with right thinking or right judgment ... being or remaining within the bounds of reason; not extreme; not excessive." *Reasonable*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981). "Value" is defined as "the monetary worth of something." *Value*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981).

Factors that may be considered when determining the reasonableness of a fee are: (1) the time and labor required, the novelty and difficulty of the question involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the amount involved and the results obtained; (4) the fee customarily charged in the locality for similar services; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Co.*, 945 S.W.2d 812, 818 (Tex.1997). With these definitions and the appropriate standard of review in mind, we now turn to the instant case.

Shamoun testified he worked between 150 and 400 hours on the global settlement. When he reviewed his calendars and records, he excluded any time charged on the hourly fee agreements so there was no overlap.

Sayles testified that in his expert opinion, the reasonable value of S & N's global settlement services between March 27, 2010 and May 5, 2010 equaled $15,912,500. He agreed that while time and labor was significant, he believed the fee "based on a time factor alone would not be justified." However, in reaching his opinion, Sayles also considered the *Andersen* factors. Specifically, he described the novelty and difficulty of the questions involved as "the most complex array of litigation" he had ever seen, particularly considering not only the legal complexity but also the complexity of the family relationships. When describing the skill required to perform the legal services, Sayles said few lawyers have the "intelligence and wit" to match Malouf on a strategic basis, and it took enormous skill on Shamoun's behalf to negotiate head-to-head with him. When asked about Shamoun's experience, reputation, and ability, Sayles said Shamoun's skill and ability is "quite high." He described the opposing litigation team as "one of the most formidable teams one could assemble in the country." Given the complexity of all the cases involved, Sayles said Shamoun had little time to work on anything but the global settlement, which precluded other employment. Further, the looming trial date for the RICO case imposed enormous pressure so attempts to settle had to occur in a "very crunched and expeditious basis."

When considering the amount involved and the results obtained, Sayles testified a billion dollars was at stake and written demands were as high as $100 million. He considered the global settlement a "remarkable achievement" that was beneficial to all sides. Sayles acknowledged the fee request was high, but he also explained that cases such as these are rare so he had little by which to compare. That being said, he believed the fee was reasonable.

Finally, Sayles acknowledged Shamoun and Hill had never worked together before

this case; however, he explained a new client is likely to be charged more than one who has provided an attorney with repeated cases through the years. Sayles testified the case was undesirable because of the deep-seated family feelings involved and because clients on both sides expressed strong opinions about how things should be done.

In sum, Sayles considered the *Andersen* factors individually and then looked at the whole picture before reaching his opinion that $15,912,500 was a fair and reasonable fee for S & N's services. He further explained to the jury that an unconscionable fee is one no competent lawyer could find reasonable, and in his opinion, S & N was not seeking an unconscionable fee.[4]

Reviewing the record in the light most favorable to the jury's finding, we conclude S & N presented more than a scintilla of evidence to support the jury's finding that the "monetary worth" of his services "within the bounds of reason" was $7,250,000 and such a finding was "not extreme," particularly given that the jury awarded approximately half of the amount S & N's expert said was reasonable. *See Vela v. Wagner & Brown, Ltd.,* 203 S.W.3d 37, 51 (Tex.App.—San Antonio 2006, no pet.) (upholding jury award of damages that fell within the range of evidence presented even though award was less than expert's opinion). Thus, the trial court could not have granted Hill's motion to disregard jury finding number 2 on the ground of insufficient evidence. *See City of Keller,* 168 S.W.3d at 810.

In reaching this conclusion, we reject Hill's argument that a $48,000 hourly rate cannot be justified as "reasonable" and his attempt to mischaracterize the nature of the damages sought by S & N. Neither Hill nor S & N presented evidence to the jury that an hourly rate times the number of hours worked was the proper method of calculating the reasonable value of services. While we acknowledge the jury heard evidence of Shamoun's hourly rate and number of hours worked under the limited fee agreements, those calculations are irrelevant when considering the reasonable value of services performed *outside* of those agreements. As S & N explains, the amount of attorney's fees awarded by the jury was less than one percent of the value of a trust that Hill gained control of as a result of S & N's efforts.

We likewise reject Hill's argument that an award amounting to $48,000 an hour violates his due process rights. First, as noted above, Hill's argument is based on an incorrect premise that the jury relied on evidence of the hourly rate Shamoun charged and the number of hours he worked reaching the global settlement. Second, Hill's reliance on *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) is not justified because it involved the imposition of excessive punitive damages. Here, the jury was not asked to determine punitive damages, but rather determined a measure of compensa-

4. Jim McCormack provided expert testimony challenging Sayles's opinions. He believed S & N's requested fee was unreasonable and unconscionable because S & N was already being paid hourly under the limited fee agreements. When asked how much of the litigation file he reviewed in reaching his conclusions, he admitted he reviewed only about a linear foot of documents. Sayles, on the oth-

er hand, testified he reviewed over three hundred linear feet of documents. Thus, the jury heard testimony from two experts about the reasonableness of the fees requested by S & N. It chose to believe Sayles's testimony and to disbelieve McCormack, which it was free to do as the sole judge of witness credibility. *City of Keller,* 168 S.W.3d at 819.

tory damages. Thus, Hill's authority is irrelevant.

Finally, in concluding the evidence was legally sufficient to support the jury's answers to questions 1 and 2, we are unpersuaded by Hill's argument that the jury's answers were "immaterial." In particular, Hill argues that because quantum meruit is an equitable claim, the trial court—not the jury—determines "whether and how much recovery shall be awarded to the plaintiff." Presumably, under Hill's argument, any jury verdict on quantum meruit would be subject to the trial court's oversight and correction on equitable grounds.

To support his argument, Hill relies on general language in two supreme court cases setting out the unremarkable proposition that "[m]atters of equity are addressed to the trial court's discretion." *See Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 163 (Tex.2004); *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998). Neither case, however, addresses the standard for reviewing a jury's quantum meruit determinations. Rather, both dealt with an award of attorney's fees under the Texas Declaratory Judgments Act. Neither case can be interpreted to allow a trial court to disregard a jury's finding on disputed facts in rendering a quantum meruit judgment and wholly substitute its own judgment. *See, e.g., In re Freligh,* 894 F.2d 881, 887 (7th Cir. 1989) ("A modern federal equity judge does not have the limitless discretion of a medieval Lord Chancellor to grant or withhold a remedy.... [I]n cases where the plaintiff has an established entitlement to an equitable remedy, the judge cannot refuse the remedy because it offends his personal sense of justice."). To agree with Hill, and completely ignore the jury's findings, would imbue a trial court with unbridled discretion, a result that would violate the fundamental doctrine of equity, which is to afford complete and full justice. *See Holland v. W. Bank & Trust Co.,* 56 Tex.Civ.App. 324, 118 S.W. 218, 219 (Tex.Civ.App.—Austin 1909, no writ). Further, it would require this Court to ignore case law that holds the jury determines questions of contested facts. *See Hudson v. Cooper,* 162 S.W.3d 685, 688 (Tex.App.—Houston [14th Dist.] 2005, no pet.); *see also Thygesen v. Strange,* No. 14–09–00866–CV, 2013 WL 2247381, at *3 (Tex.App.—Houston [14th Dist.] May 21, 2013, pet. denied) (mem. op.).

But even if we assumed the trial court has some discretion to alter the jury's verdict on equitable grounds, that discretion would be limited to the following equitable considerations: whether (1) Hill has been unjustly enriched, (2) S & N would be unjustly penalized if Hill retained the benefits of the services without paying for them, and (3) Shamoun or S & N had "unclean hands." *Hudson,* 162 S.W.3d at 688. The evidence in this case does not support the trial court's actions based on those considerations.

The record is replete with evidence demonstrating Hill would be unjustly enriched if he were permitted to reap the reward for Shamoun attaining a global settlement without paying anything for his services. Shamoun served as the unifying voice during an intense, contentious, and personal litigation. Hill knew Shamoun expected to be paid for his services. As detailed above, Hill received many benefits from the global settlement.

Because of the time, effort, and energy Shamoun exerted in obtaining the global settlement, taking away the jury's award would unjustly penalize S & N. Clearly, the jury determined S & N had been unjustly penalized by Hill's refusal to pay when it awarded $7,250,000 for S & N's reasonable services. By taking away the

award, the trial court reinstated the unjust penalty.

Lastly, we consider whether Shamoun or S & N had unclean hands. Hill submitted questions to the jury asking whether Shamoun breached his fiduciary duty, engaged in a civil conspiracy, or breached contracts. The jury answered all questions in Shamoun's and S & N's favor. Moreover, Hill has not presented any other evidence showing Shamoun or S & N acted with unclean hands. Accordingly, the record does not support the trial court's exercise of discretion in disregarding the jury's quantum meruit findings based on equitable considerations. We sustain S & N's first issue.

Having ruled in favor of S & N on its first issue, we need not consider whether the trial court erred in granting a pre-trial partial summary judgment against S & N on the quasi-estoppel counter-defense and the breach of contract claim. Accordingly, S & N's third issue is moot. *See* TEX. R.APP. P. 47.1. We likewise need not address S & N's fourth issue in which it requests this Court to vacate the judgment and remand to the trial court for an entry of an order stating its reasons for disregarding the quantum meruit verdict. *Id.*

### Trial Court's Failure to Instruct the Jury on Segregation

■ In a second conditional crosspoint, Hill argues even if the evidence supports the jury's award, he is entitled to a new trial because the trial court failed to instruct the jury that S & N's services were "compensable" only if they were not covered by a preexisting contract. S & N responds Hill failed to preserve this issue for review, or alternatively, Hill did not submit an instruction similar in language to the instruction he urges on appeal.

■ A trial court "shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R. CIV. P. 277. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Transcon. Ins. Co. v. Crump,* 330 S.W.3d 211, 221 (Tex.2010). Generally, we review the trial court's decisions on the jury charge for an abuse of discretion; however, when a party challenges a definition as legally incorrect, we review the definition de novo. *Id.* If the charge is legally correct, the trial court has broad discretion regarding the submission of questions, definitions, and instructions. *Cont'l Cas. Co. v. Baker,* 355 S.W.3d 375, 382 (Tex.App.— Houston [1st Dist.] 2011, no pet.).

To preserve a charge error for appellate review, a party must "point out distinctly the objectionable matter and the grounds of the objection." TEX.R. CIV. P. 264. "Any complaint as to a question, definition, or instruction on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id.* Objections to the charge and requests for instructions must comport with the arguments made on appeal. *Cont'l Cas. Co.,* 355 S.W.3d at 382.

Question number 1 read as follows:

Did Shamoun & Norman, LLP perform compensable global settlement services for Albert G. Hill, Jr.?

One party performs compensable global settlement services if such services are valuable services and are rendered for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the services.

The clerk's record includes Hill's Requested Special Instructions and Questions with a tendered instruction for question number 1, marked "refused" by the trial

court. Hill's proposed instruction read as follows:

> One party performs compensable global settlement services if such services are valuable services and are rendered for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the services *but does not pay.*

(Emphasis added.) Further, Hill objected during the charge conference that the instruction should include the above-emphasized language. Thus, S & N's argument that Hill failed to present and the trial court failed to rule on his request is without merit.

However, on appeal, Hill raises a different objection than he raised below. Hill's proposed instruction to the trial court did not include language that services were compensable only if they were not covered by a preexisting contract. Rather, Hill's proposed instruction merely requested the addition of "but does not pay," which did not add any additional meaning to the substantially correct wording already before the court. *See* Tex.R. Civ. P. 278 ("A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question."). While Hill objected to "global settlement services," as "undefined, undeterminative, uncertain, fails to differentiate between services covered, subject matter covered by the contracts and the services not covered by those contracts," his objection was not sufficiently specific to put the trial court on notice that his objection included "compensable" as an undefined term. *See Cont'l Cas. Co.*, 355 S.W.3d at 383 (appellant must clearly designate alleged error and specifically explain basis of complaint in objection to charge to preserve charge error). Moreover, Hill has not challenged on appeal the trial court's

failure to define "global settlement services." Thus, because Hill's issue on appeal does not comport with his trial court objection, his issue is not preserved for our review. *Id.* at 382. Accordingly, Hill's conditional cross-point is overruled.

## Recovery of S & N's Attorney's Fees to Prosecute the Quantum Meruit Claim

In its second issue, S & N contends it is entitled to its reasonable and necessary attorney's fees incurred in prosecuting the quantum meruit claim against Hill and no evidence supports the jury's award of $0. S & N requests this Court to render judgment on the amount of fees proven, or alternatively, to remand for a new trial on attorney's fees. Hill responds the trial court correctly denied S & N's motion to disregard the jury's answer to question number 3 because S & N's quantum meruit claim failed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(1) (West 2015) (allowing recovery of attorney's fees for services rendered); *see also Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997).

A party prevailing on a quantum meruit claim is entitled to recover attorney's fees. *See Gentry v. Squires Constr., Inc.,* 188 S.W.3d 396, 406 (Tex.App.—Dallas 2006, no pet.). Having concluded S & N is entitled to the jury's $7,250,000 award for quantum meruit, we must consider whether the trial court erred by rendering judgment on the jury's $0 finding for attorney's fees.

Under some circumstances, an award of zero attorney's fees to the prevailing party is proper. A zero award is proper if the evidence failed to prove that any attorney's services were provided or failed to prove the value of the services provided. *McMillin v. State Farm Lloyds,* 180 S.W.3d 183, 209–10 (Tex.

App.—Austin 2005, pet. denied); *Recognition Commc'n, Inc. v. Am. Auto. Ass'n,* 154 S.W.3d 878, 891 (Tex.App.—Dallas 2005, pet. denied). A zero award is also proper if the evidence affirmatively showed that no attorney's services were needed or showed that any services provided were of no value. *McMillin,* 180 S.W.3d at 209–10; *RCI,* 154 S.W.3d at 891. However, a jury cannot simply refuse to award attorney's fees if any were properly proven. *RCI,* 154 S.W.3d at 891.

 Uncontroverted testimony by an interested witness may establish a right to attorney's fees as a matter of law. *Id.* Testimony by an interested witness establishes a fact as a matter of law if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. *See id.; see also Lofton v. Tex. Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989). Where trial counsel's testimony concerning attorney's fees is clear, positive, direct, and uncontroverted, it is taken as true as a matter of law, especially when the opposing party had the means and opportunity to disprove the testimony and failed to do so. *McMillin,* 180 S.W.3d at 210.

S & N contends it offered uncontroverted evidence through the testimony of Daniel Tostrud that it incurred $908,955 in fees and expenses as a matter of law. We agree Tostrud's testimony provided evidence that attorney's fees in prosecuting the quantum meruit claim were reasonable and necessary. Thus, attorney services were provided and such services had value. *See RCI,* 154 S.W.3d at 891. Consequently, there is no evidence to support the jury's finding of zero attorney's fees for S & N's prosecution of the quantum meruit claim. *See Citibank (S.D.), N.A. v. Tran,* No. 05–11–01423–CV, 2013 WL 3205878, at *6 (Tex.App.—Dallas June 21, 2013, pet.

denied) (mem.op.) ("A trial court may disregard a jury's negative finding if there is no evidence to support the finding."). Thus, S & N is entitled to recover some of its fees.

 Hill argues, however, that S & N failed to segregate compensable fees from those incurred on failed claims. Therefore, he contends S & N has not proven its fees as a matter of law. We agree. When "it cannot be denied that at least some of the attorney's fees are attributable only to claims for which fees are not recoverable, segregation of fees ought to be required and the jury ought to decide the rest." *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 314 (Tex.2006). Hill asked Tostrud during cross-examination if S & N was seeking fees incurred in pursuing claims against Benedict, Miller, and A.G. Hill Partners, which were parties eventually nonsuited. Tostrud testified those parties' fees were included within the time "but all that time—the amount of time that we spent analyzing the issues, pursuing claims against those three Defendants as opposed to Mr. Hill was de minimis, it was very little." However, when pressed further about whether S & N was seeking fees for claims no longer part of the case, which included quasi-estoppel and breach of contract, Tostrud answered affirmatively. Thus, we cannot conclude Tostrud provided clear, direct, and uncontradicted testimony establishing S & N's right to recover a particular amount of attorney's fees as a matter of law. *See Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.,* 300 S.W.3d 738, 739 (Tex.2009) (concluding attorney's fees were not supported by uncontroverted testimony when attorney admitted on cross examination that some fees involved claims against other parties). However, S & N's failure to segregate does not mean it cannot recover

any fees. *See Tony Gullo Motors I, LP,* 212 S.W.3d at 314. We sustain S & N's second issue and remand for a determination of its reasonable and necessary attorney's fees in prosecuting the quantum meruit claim.

### Failure to Properly Instruct Jury on Wright's Breach of Fiduciary Duty

In his third cross-point, Hill argues the trial court erred by submitting a question allowing the jury to find Wright breached her fiduciary duty to Hill only if she failed to maintain her records in connection with her representation of Hill after termination of the attorney–client relationship. Hill contends this improperly narrowed the scope of fiduciary duty and was a clear misstatement of law. In addition, Hill claims the question was "devastating" to his conspiracy claim because the question prevented the jury from finding Shamoun liable for conspiracy unless it first found that Shamoun and Wright conspired about Wright's record keeping.[5] S & N responds Hill waived his cross-point because (1) he failed to make the court aware of his complaint; (2) he failed to submit a substantially correct instruction; and (3) the trial court properly rejected the question because it was not supported by pleadings or evidence.

We agree with S & N that Hill failed to preserve his cross-point for review. Texas Rule of Civil Procedure 274 provides that a "party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." TEX.R. CIV. P. 274. Further, "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id.* "The aggrieved party must show that the trial court was aware of the party's request and denied it." *Cruz v. Andrews Restoration, Inc.,* 364 S.W.3d 817, 831 (Tex.2012). The trial court's awareness is key. *Id.*

Hill contends the trial court was "well aware" of his complaints, but the record is less conclusive. Although the trial court denied and signed his requested special instruction, the instruction did not make the trial court aware of Hill's complaint on appeal that question number 6 improperly narrowed the scope of fiduciary duty or limited the jury's ability to consider Hill's conspiracy claim against Shamoun. Thus, the trial court's ruling on the requested special instruction does not preserve Hill's complaint for review.

During the charge conference, Hill's attorney reminded the trial court he had

---

5. Question number 6 read as follows:
Did Frances Wright fail to comply with her fiduciary duties to Al Hill, Jr. in maintaining her records in connection with her representation of Albert Hill, Jr. after termination of the attorney-client relationship between Frances Wright and Albert Hill, Jr.?
As Albert Hill, Jr.'s attorney, Frances Wright owed Albert Hill, Jr. a fiduciary duty. To prove that she failed to comply with her duty, Albert Hill, Jr. must prove that:
1. Frances Wright did not make reasonable use of the confidence that Albert Hill, Jr. placed in her; or
2. Frances Wright failed to act in the utmost good faith and exercised the most scrupulous honesty toward Albert Hill, Jr.; or
3. Frances Wright placed her own interests before that of Albert Hill, Jr., or used the advantage of her position to gain a benefit for herself at the expense of Albert Hill, Jr., or placed herself in a position where her self-interest might conflict with her obligations as a fiduciary; or
4. Frances Wright failed to fully disclose all important information to Albert Hill, Jr.
Answer "Yes" or "No."
The jury answered, "No."

filed special instructions, proposed questions, and certain objections. The trial court stated, "I don't have time to read through all of this and give you a written order." Counsel said he understood and shortly thereafter said, "There was Question Number 6, we had a different way to present the question." This vague comment did not apprise the trial court of any complaint or objection to the fiduciary duty question or how the question, as written, limited the jury's ability to consider Hill's conspiracy claim against Shamoun. If anything, it indicated Hill did not have an objection to the substance of the question but merely wanted different wording. "A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question." Tex.R. Civ. P. 278. Hill did not make any further argument to clarify his objection to question number 6.

 Although trial courts must prepare and deliver the charge, "we cannot expect them to comb through the parties' pretrial filings to ensure that the resulting document comports precisely with their request—that is the parties' responsibility." *Cruz*, 364 S.W.3d at 831. Because the trial court indicated on the record it was not taking the time to read through Hill's submitted objections and the only "objection" Hill provided on the record did not timely and plainly make the trial court aware of the complaint he now raises on appeal, we conclude Hill failed to preserve his issue for review. *Id.* at 829; *see also* Tex.R.App. P. 33.1; Tex.R. Civ. P. 272. Accordingly, we overrule Hill's third cross-point.

### Spoliation of Evidence

In a fourth cross-point, Hill argues the trial court abused its discretion by failing to instruct the jury on spoliation of evidence. S & N responds Hill failed to preserve his argument for review. Alter-

natively, S & N contends Hill failed to obtain the requisite findings for the instruction, Hill's requested instruction was not substantially correct, and the evidence did not justify an instruction.

We first address S & N's waiver argument. The clerk's record contains a copy of the requested instruction, checked refused, and signed by the court on May 9, 2013. Thus, the record shows Hill timely made the court aware of his desire for a spoliation instruction, and the court ruled on the instruction. Accordingly, Hill has preserved his issue for review.

 We now consider whether the evidence justified a spoliation instruction. We review a trial court's denial of a spoliation instruction for an abuse of discretion. *MRT, Inc. v. Vounckx*, 299 S.W.3d 500, 510 (Tex.App.—Dallas 2009, no pet.). In *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 19 (Tex.2014), the Texas Supreme Court crafted a "complete analytical framework for determining whether an act of spoliation has occurred." The party alleging spoliation bears the burden of establishing the nonproducing party had a duty to preserve the evidence. *Id.* The standard governing the duty to preserve evidence encompasses when the duty is triggered and the scope of that duty. *Id.* A duty is triggered "only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Id.* (citing *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex.2003)). Then, if a duty to preserve evidence existed, the party seeking a remedy for spoliation must demonstrate the other party intentionally or negligently breached its duty to preserve the relevant evidence. *Id.*

■ In his spoliation motion and at a pretrial hearing, Hill argued S & N knew litigation regarding the parties' alleged fee agreement was reasonably foreseeable by May 4, 2010, yet Shamoun failed to preserve emails and text messages involving Hill. S & N, however, claimed any alleged duty to preserve evidence arose no earlier than May 24, 2010, which was the date Shamoun returned Hill's client files. Both parties relied, partly, on the content of a May 4 phone conversation between the two men, which Shamoun recorded.[6]

According to Hill, the content of the conversation indicated Shamoun knew of potential litigation over the alleged fee agreement because Shamoun referenced "conflict" if Hill did not intend to follow through on the agreement. Shamoun responded no duty arose on May 4, 2010, because the "conflict," when read in context of the whole conversation, referred to Shamoun's request to talk with Hill's financial advisor, Miller, about the agreement and ensured that if he talked to Miller, there would not be any conflict between Hill and Shamoun. Shamoun also later explained in his deposition that "if" a conflict ever arose about Hill's obligation to pay under the agreement, the recorded conversation would be helpful, which again supported Shamoun's belief that on May 4 a substantial chance for litigation did not exist. Based on this evidence, it was within the trial court's discretion to determine S & N had no duty in early May to preserve emails and texts between Shamoun and Hill.

■ Even assuming S & N had a duty to preserve evidence, the record supports a finding that the trial court could have determined S & N did not intentionally destroy evidence. S & N presented evidence that a "computer glitch" with its servers resulted in only Shamoun's emails being destroyed. Shamoun willingly admitted some emails were lost but said the inadvertent loss was beyond his control. The loss occurred while a third party performed server updates. An email sent on May 12, 2010, from Greg Moore to Shamoun explained the unexpected corruption of the old server and said, "As of right now, expect that all of your e-mail that has not been moved into iManage (Doc Management) is gone and not recoverable."

Dennis Holmgren, an attorney with S & N and the designated IT person, testified in a deposition that prior to May 2010, S & N migrated most of its user boxes from an Exchange 2003 server to an Exchange Server 2007 Enterprise. Shamoun's email box was not immediately migrated over because the process was time consuming, and it was difficult to find time when Shamoun could be without email access given his busy trial docket.

Holmgren confirmed that only Shamoun's email box was not moved; otherwise, "[w]hat was there before the migration was there after the migration." He said there were no copies of any box made prior to the migration because "the migration was the copy." Everything was left intact on the old server until accounts were migrated to the new server. Holmgren explained: "Once they were migrated to the new server, we took a look and made sure the data made it. If the data made it successfully, then the data made it successfully." He also stated Shamoun's box was not lost as part of the migration, but was lost around May 12 when the older server crashed because of stability

---

6. Hill repeatedly emphasized in both his motion below and on appeal that Shamoun "secretly" recorded the conversation; however, it is not unethical for an attorney to record a client conversation without the client's permission. *See Tex. Ethics Comm'n Op.* 575, 2006 WL 4045664 (2006).

problems. He specifically stated there was "nothing nefarious involved in why Gregory's e-mail box crashed and nobody else's did."

While Hill argued S & N should have taken steps to preserve these emails, Holmgren explained the data was not backed up before the migration occurred because they did not have "the version of back up Exec that worked with '08 licensed yet." Holmgren further stated they were not running backups on the email server and did not start backing up the new server until post-migration of the 2003 server. He admitted S & N used a Dell autoloader to back up tapes and other electronic data in 2010, but he explained it "died" sometime in 2010.

Despite Hill's arguments about the timing of the server crash and only Shamoun's emails failing to successfully migrate, the trial court heard evidence explaining the computer "glitch." Moreover, the trial court heard evidence that Shamoun and Wright never exchanged emails about the alleged fee agreement and, if they did, it was Wright's practice to print a hard copy to her file. Thus, if any emails existed, she produced them. Accordingly, the record does not support Hill's allegation that S & N intentionally destroyed emails related to the litigation.

In addition to the emails, Hill alleged S & N intentionally deleted text messages. Hill argued cell phone records subpoenaed from AT & T showed potentially relevant text messages between Shamoun and Wright *could* have been deleted. There was no evidence, however, that any texts actually were deleted. Holmgren testified he "dumped" the text messages from Shamoun's phone in August 2011 and created a text file for others to review and determine what should be produced in discovery. Further, Shamoun and Wright denied texting about the fee agreement.

Thus, the record does not support Hill's allegation that S & N intentionally destroyed text messages.

Given the evidence, we cannot conclude the trial court acted outside its discretion by denying Hill's request for a spoliation instruction. We overrule Hill's fourth cross-point.

### Conclusion

We reverse the trial court's judgment as to S & N's quantum meruit claim and render judgment reinstating the jury's $7,250,000 verdict. We reverse the trial court's judgment as to attorney's fees and remand to the trial court for a determination of S & N's reasonable and necessary attorney's fees in prosecuting the quantum meruit claim. In all other aspects, the judgment of the trial court is affirmed.